McWHIRTER v. MONROE CALCULATING MACH. CO., Inc.

No. 2203.

District Court, W. D. Missouri, W. D.

Feb. 16, 1948.

Clarence C. Chilcott, Terrance W. Imes and Marion D. Waltner, all of Kansas City, Mo., for plaintiff.

Stinson, Mag, Thomson, McEvers & Fizzell, Paul R. Stinson and Dick H. Woods, all of Kansas City, Mo., for defendant.

DUNCAN, District Judge.

Plaintiff, a resident of Kansas City, Missouri, and former local district manager of Marchant Calculating Machine Company, brought this suit under Title 15, U.S.C.A. § 15, against the defendant, a

resident and citizen of New Jersey, to recover damages alleged to have been sustained by him as a result of the unfair trade practice of the defendant in the sale of Monroe Calculating Machines in the Kansas City territory, in violation of Title 15 U.S.C.A. § 13.

Marchant and Monroe are old and well known manufacturers and distributors of calculating machines. Plaintiff, as manager of the local district of the Marchant, operated on a commission basis, receiving 35 per cent of the sale price of each sale made. Out of his commission plaintiff bore the expenses of the district office, with the exception of the repair department, for which he received an allowance from the home office.

Plaintiff employed numerous persons from time to time in his sales organization, some of whom worked on commission and some on straight salary. From the evidence it is impossible to determine accurately who worked on commission and who received salary and for what period of time. Apparently whether a salesman received commissions or salary depended on his volume of sales. During a certain training period new salesmen were on salary, or if their sales were not adequate to enable them to live, they were placed on salary. There is no substantial evidence in the case from which the Court can determine how much salary was paid and to whom it was paid by plaintiff. Some salesmen were on a salary part of the time and received commissions at other times during their employment.

Those who were on a commission basis received 20 percent of the total commission. The salesmen who worked outside of Kansas City received 25 percent commission, and for this extra 5 percent they paid their own expenses. The sales methods of all competing manufacturers of this type of equipment are pretty much the same. The evidence indicates that certain schedules of prices and discounts and trade-in allowances were formulated; and discounts were not supposed to be allowed to purchasers of single machines or, generally, to purchasers of less than 10 machines yearly. Purchasers of 10 or more machines a year were allowed a discount of 10 percent. This practice was known as a deductible quantity discount. Another practice was known as the cumulative discount plan. Under this plan a potential purchaser of 10 machines a year was promised a refund of 10 percent if at the end of the year such purchaser had purchased 10 or more machines. During the year the purchase price was the regular price without discount, but if at the end of the year the number had amounted to 10 or more, 10 percent was refunded.

Still another plan was designed for multiple purchasers or purchasing organizations where a number of persons had associated themselves together and set up a central or common purchasing authority. To such organizations a discount was allowed, and also to contractors engaged in the manufacture of war materials for the Government under a cost plus contract where the Government paid for equipment. Discounts were also allowable to a subsidiary of a parent organization which purchased 10 or more machines yearly. These trade practices were in effect in Kansas City during the period of this controversy.

Plaintiff insists that defendant was guilty of unfair trade practices in that it sold to one customer more cheaply than to another customer for the purpose of destroying competition and establishing a monopoly which resulted in damage to plaintiff.

Almost immediately upon plaintiff's taking over the offices in Kansas City, controversy arose between the two sales organizations. Competition seemed to be quite spirited. Each accused the other of granting discounts to purchasers who were not included within the plans or systems heretofore described. To sustain his contention, plaintiff, among other things, proved that on April 11, 1939, defendant through its local manager entered into an agreement with one Logan W. Wilson, an assistant cashier of the First National Bank of Kansas City, Missouri, under the terms of which discounts might be received by purchasers of Monroe machines on the theory that they were subsidiaries of the First National Bank. This agreement was

in the form of a letter addressed to the local manager of Monroe by Wilson.[1]

Under one of the existing discount plans it was proper to allow a discount to a purchaser who was a subsidiary of another purchaser if the parent organization, together with its subsidiaries, purchased sufficient machines within a year to be entitled to a discount. It was for the purpose of bringing purchasers, not otherwise eligible for a discount, within this particular classification that the contract with Wilson was entered into. The First National Bank was made a party to this suit, but at the close of plaintiff's case a motion to dismiss as to the bank was sustained on the ground that the contract was unauthorized by the bank, that it had no knowledge or information concerning its execution and received no benefit from any sales that were made pursuant to it, and that it was outside the scope of the authority of the assistant cashier to enter into the contract.

Under the contract discounts were allowed on the sale of 40 machines. When the sales representative of the Monroe Company found it necessary or desirable in his opinion for the purpose of making a sale, a discount of 10 percent was offered under the terms of the contract. In some cases, but not all, the prospective purchaser was advised that a discount could be obtained through the First National Bank by claiming to be a subsidiary of such bank. When the sale was finally made, the application or the order was submitted to Wilson and authority was received from him by the Monroe representative to allow the discount to the purchaser as a subsidiary of the bank. None of these purchasers was in fact a subsidiary of the First National Bank. Many of them were not even depositors in the bank. This practice was continued during the period in controversy in this suit, that is, from April 11, 1939, through 1942. Finally, being unable to stop the practice, plaintiff brought this suit and seeks to recover damages in the sum of $35,000 for loss of profits from his business, time and money lost in training and paying salesmen unable to compete "with said unlawful practices", inability to maintain a sales force in the face of such practices, and loss of a more profitable agency through inability to show a sufficient sales volume to justify a contract with Marchant for a more profitable agency. Since Title 15 U.S.C.A. § 15, authorizes the recovery of treble damages and a reasonable

---

[1] The First National Bank
of Kansas City, Mo.
April 11, 1939
Monroe Calculating Machine Company,
    Inc.
Orange
New Jersey
Gentlemen:
It is mutually understood and agreed between your Company and ours that on all purchases of new Monroe Adding-Calculators, Listing, Bookkeeping, and Check Writing and Signing Machines, we shall receive a discount of 10% deductible at the time of billing.
This arrangement is effective from April 15, 1939, and shall continue from year to year so long as we shall have purchased an average of not less than ten machines for each preceding yearly period.
It is further understood and agreed that the machines eligible to the discount under this arrangement shall be of any new model or models regularly sold and listed by you, and that you will deliver such machines, charges prepaid, (to any point in the United States) as and when ordered by us within the year.
A list of our qualified branches and subsidiaries entitled to participate in this Agreement will be furnished with the understanding that they will be eligible to the discount under this arrangement, and their purchases will be considered as a part of the quantity, it being a condition that such purchases shall be for the continuous individual use of our Company and its qualified branches and subsidiaries.
It is further understood that all machines purchased under this Agreement will carry your regular one-year guarantee, and that orders will be filled with reasonable promptness, barring any delays due to causes beyond your control.
Signed First National Bank,
    Kansas City, Mo.
By /s/ L. W. Wilson, Assistant Cashier
Approved and accepted:
Monroe    Calculating    Machine    Company,
    Inc.
By /s/ Hubert W. Ryan
Date May 2, 1939

attorney's fee, plaintiff seeks to recover total damages of $105,000 and an attorney's fee of $25,000, and his costs.

Defendant insists that the acts complained of are not in violation of Title 15 U.S.C.A. § 13, and for that reason plaintiff cannot maintain his action under Title 15 U.S.C.A. § 15. It denies that it was guilty of any unfair trade practices and that whatever deviation there was from the established sales practices was for the purpose of meeting competition and the discounts offered by plaintiff in the sale of the Marchant machines. It also contends that the calculating machines of the two manufacturers are not competitive in that they are not of like grade and quality. Defendant also contends that plaintiff has failed to show any damage resulting from the alleged unfair trade practices.

■ The first contention of defendant, that is, that plaintiff is not authorized to maintain the action, must be resolved against it. Title 15 U.S.C.A. § 13, provides that: "(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *".

Section 15 of the same title provides that:
"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Section 13 makes it a violation of the law to discriminate in price between different purchasers of commodities of like grade and quality. It is alleged that the defendant discriminated between purchasers of commodities of like grade and quality in that he granted to some who were not entitled thereto a 10 percent discount which was refused to others similarly situated; that it was done for the purpose of preventing competition—and creating a monopoly; and that as a result thereof this plaintiff, as manager of a competing company and who received his compensation through commissions, was prevented from making sales and was thereby damaged. I think the plaintiff comes within the provision of the Act and is entitled to maintain his action. Roseland v. Phister Mfg. Co., 7 Cir., 125 F.2d 417, 139 A.L.R. 1013; Midland Oil Co. v. Sinclair Refining Co., D.C., 41 F.Supp. 436.

■ The next contention of defendant is that the calculating machines of Marchant and of Monroe were not commodities of like grade and quality and that, therefore, there was no violation of the statute. This contention must also be ruled against defendant.

Each of the manufacturers of these machines was an old and reputable manufacturer of highly technical devices. Each of the devices was designed to add, subtract, multiply and divide. Plaintiff testified that the primary functions of any calculating machine are but two, to add and to subtract, but that by repetition of functional processes, the machine performs the functions of multiplication and division.

Each machine had a keyboard upon which were arranged many keys containing numerals and figures, the number of keys depending upon the size of the machine and the purpose for which the particular type of machine was designed. Each of the machines was operated by depressing whatever number of keys was necessary to produce the desired result and by either pressing a bar or pulling a

crank. This manipulation produced the correct addition. To obtain the other more complicated results, that is, to subtract, multiply and divide, the same devices and mechanisms were manipulated in a different manner which was familiar to the skilled operator. Each manufacturer sells numerous models, Marchant 6 and Monroe 18. The different models were designed to meet the demands and requirements of different types of businesses and of different types of calculations.

The salesmen, in paving the way for the sale of their machines where a machine had not already been placed, ordinarily surveyed the nature of the prospective purchaser's business. From that survey he determined the type of machine that would be most suitable for the particular business and attempted to sell that particular type of machine. In appearance the so-called comparable types of machines of the two companies may vary. One may be larger than the other, but they are generally designed to perform the same general functions in their respective classifications. It is true, as alleged by defendant, that the price or original cost of the two makes of machines varies. The cost of the Marchant machine is higher than that of the Monroe, this excess ranging from $25 to $50 in the smaller and cheaper models to several times that amount in the larger models. The machines range in price from around $300 to more than $1,000. To this contention plaintiff answers that Marchant machines are more valuable to the user because of certain refinements not found in the Monroe machines and are, therefore, worth the dollars and cents difference, even though performing the same functions. Calculating machines are designed to last many years, and the original cost is spread over that period of time. The person who is able to buy a calculating machine, be it small or large, having in mind the probable life of the machine, likely would not be greatly influenced by a comparatively small difference in the cost of the two makes of machines. Purchasers of calculating machines are undoubtedly like the purchasers of other types of rather expensive equipment in this modern and highly developed mechanical age.

In the purchase of typewriters, adding machines, automobiles and other forms of equipment and conveniences, many persons have their preferences. One person may have a preference for a particular model or make of typewriter simply because he or she has used that make or model and will purchase it at a greater price in preference to another make or model of equal value or utility. Many of the machines involved in this controversy were sold to persons or to businesses where the operators were accustomed to using that particular make or model, be it one or the other make. One of the strongest arguments that the machines were competitive was the strong competition itself which the sales organizations of the two companies engaged in to sell their respective machines to the same prospective purchasers for the same kind of work.

Furthermore, it was admitted that Marchant and Monroe are competitors, so that whether or not their machines were of like grade and quality, if Monroe discriminated between purchasers of its commodities of like grade and quality and the effect of such discrimination was to tend to create a monopoly or to lessen or destroy competition, there was a violation of the statute. If plaintiff was injured thereby in his property or business, he may recover.

Thus having determined the two legal obstacles to plaintiff's recovery, we may proceed to the factual questions. Those questions may to a considerable degree be grouped for determination, that is, whether defendant was guilty of any unfair trade practices or whether the granting of discounts was for the purpose of meeting competition and whether plaintiff sustained any damage.

Defendant charged that plaintiff cast the first stone; that he inaugurated the practice of violating the trade practices of the respective parties by granting excessive trade-in allowances. I doubt that either party ever lost a sale through failure to grant a discount or a trade-in allowance if he thought he could get by with it. One cannot escape the conclusion that there were numerous exceptions to the established trade practices of the parties; and

that the matter of granting discounts was so full of loopholes and exceptions that it had little practical value except as to obscure purchasers who had no business connections to whom they could attach themselves for the purpose of coming under some recognized exception. The multiple purchasing group, the discount arrangements, the annual purchasing power, the subsidiaries, the nationally known organizations and some other groups were exceptions to the rule, so that when a sale · was being negotiated it would be as much a problem to determine if a discount should not be allowed as it would be to determine if a discount should be allowed. In the matter of sales to Government agencies— for example, to Government contractors— I fail to find anywhere in the evidence that a sale was lost by either party because of the failure to determine whether or not to allow a discount. The doubt was always resolved in favor of the discount.

■ It is a well established principle of law that notwithstanding what the established trade practices and customs between competitors may be, competitors may always allow such discounts and reductions in price as may be necessary to meet competition. Title 15 U.S.C.A. § 13(b), American Co-Operative Serum Ass'n v. Anchor Serum Co., 7 Cir., 153 F.2d 907; General Shale Products Corp. v. Struck Construction Co., 6 Cir., 132 F.2d 425. That kind of competition may be what is commonly known in the language of the street as "cut throat" competition. But it is the kind of competition that may be met by a competitor by like practices. When he knows what his competitor is going to do in the way of making discounts, he may formulate his policy in such a manner as to meet that competitive situation. In this case, however, we have a different situation. The defendant inaugurated a system of competition that was far more reprehensible than "cut throat" competition. It was a subtle and underhanded kind of competition.

The agreement was secretly entered into with the officer of the First National Bank; and I say secretly because that agreement was not known to the Board of Directors of the bank and was apparently done solely for the purpose of permitting Monroe to make discounts to purchasers who had not the slightest claim or right to a discount under any of the regulations. The contract with Wilson and the allowance of discounts thereunder to purchasers not subsidiaries of the bank clearly was an unfair trade practice; and the conclusion is inescapable that it was entered into for the purpose of stifling and destroying competition and not for the purpose of meeting competition.

■ But while the Wilson contract and the practices thereunder are to be condemned in no uncertain terms as an unfair trade practice, plaintiff must show by positive proof that he suffered damage as a result thereof. Plaintiff claims that he lost every sale where he was in competition with defendant and a discount was allowed under the Wilson contract, and he claims damages in the amount of the commissions such sales would have earned. If he had any of his machines on demonstration and he failed to make the sale, he has attributed such failure solely to the allowance of the discount which the customer received.

Plaintiff testified that many of such prospective purchasers, during the period of negotiation or demonstration, asked him what discount he would allow or informed him that they could get a discount from defendant; that upon being so informed he advised such persons that if they would write on his sales agreement that they could obtain a discount from defendant, he, too, would make such an allowance, but that in each instance such purchasers refused to do so. He said that he could not give a discount and receive credit therefor from his company without such a written notation on the order or a letter to the same effect; that otherwise the discount would have been deducted by his company from his commission, and for that reason he refused to allow a discount.

In view of the nature of the unfair trade practice arising out of the Wilson contract, I have carefully reviewed the record and my own recollection of the evidence, and I fail to find a single instance where the evidence shows with that degree of positiveness which the law requires that any purchaser of a Monroe machine purchased it because of the refusal of plaintiff to

grant a discount, or, to put it another way, because of the granting of a discount by defendant.

During the period in controversy 40 machines were sold by defendant and discounts improperly allowed under the Wilson contract. How many, if any, were sold by plaintiff notwithstanding the offer of a discount by defendant is not shown by the evidence. Twenty-two witnesses who had purchased machines under the "Wilson Plan" testified that their purchases of Monroe machines were not actuated by the discount, and that other considerations such as previous use of Monroe machines or some other reason entered into their selections of that machine.

Some of the witnesses said that all things being equal the price as reflected by a discount would be a matter for serious consideration in making a purchase, but even those witnesses refused to say that the discount had been the deciding factor. These 22 witnesses represented the purchasers of most of the machines sold under the "Wilson Plan". If they are to be believed, it cannot be said that plaintiff lost any of those sales because of the unlawful discount. But plaintiff. insists that their testimony should not be accepted because they, too, were guilty of violating the law and were equally guilty with defendant in knowingly accepting an unauthorized discount. Their credibility was not otherwise attacked; they were reputable persons as far as the record shows, and at the time of the trial the statute of limitations had run against any possible action that might have been taken against them. Apparently they were disinterested witnesses who had no motive for not telling the truth. I cannot agree with plaintiff that such witnesses are unworthy of belief.

While the number of unit sales and the gross value thereof may not be determinative of the question of damages, in this case it may be and, I think, is persuasive of the fact. The business of plaintiff as well as that of defendant steadily grew during the period in controversy. During this period Marchant sold 413 machines and Monroe sold 402. The following is a record of the annual sales of the two companies in the Kansas City area:[2]

### Marchant

| Year | Units | Gross Sales | Discounts | Allowances | Net Sales |
|------|-------|-------------|-----------|------------|-----------|
| 1939 | 76 | $39,872 | $2,928 | $ 817 | $36,127 |
| 1940 | 79 | 36,051 | 2,912 | 1,503 | 31,636 |
| 1941 | 138 | 67,668 | 6,892 | 2,431 | 58,345 |
| 1942 | 120 | 70,586 | 9,143 | 1,138 | 60,305 |

### Monroe
#### (Kansas City Trade Area)

| Year | Units | Gross Sales | Discounts | Allowances | Net Sales |
|------|-------|-------------|-----------|------------|-----------|
| 1939 | 46 | $16,320 | $1,348.25 | $1,520.00 | $13,451.75 |
| 1940 | 89 | 28,247 | 1,979.13 | 3,687.50 | 22,580.37 |
| 1941 | 101 | 36,285 | 3,411.25 | 1,925.00 | 30,948.75 |
| 1942 | 133 | 42,180 | 4,171.25 | 835.00 | 37,173.75 |

### Monroe
#### (Deliveries Outside Kansas City Trade Area)

| Year | Units | Gross Sales | Discounts | Allowances | Net Sales |
|------|-------|-------------|-----------|------------|-----------|
| 1939 | 10 | 3,275 | 350.00 | 150.00 | 2,775.00 |
| 1940 | 9 | 2,950 | 312.50 | 110.00 | 2,527.50 |
| 1941 | 5 | 1,375 | 115.00 | 85.00 | 1,175.00 |
| 1942 | 9 | 2,910 | 261.50 | 230.00 | 2,418.50 |

[2] Compiled from plaintiff's exhibit #185 and defendant's exhibit No. A-4.

In 1942 plaintiff's number of sales was 57.4% greater than his number of sales in 1939. The gross value of plaintiff's sales was 77% greater in 1942 than it was in 1939. In 1942 Monroe's number of sales was 189% greater than in 1939;[3] the gross value of its sales in 1942 was 158% greater than it was in 1939. From 1939 through 1942 the percentage of discount allowed by plaintiff on his total sales was 10.2%. During the same period the percentage of discount allowed by defendant on its total sales was 8.8%. Furthermore, plaintiff's commissions increased from $5,915 in 1939 to $19,981 in 1942.

Broken down still further the figures show that plaintiff's number of sales increased 3.9 percent in 1940 while the gross value of his sales decreased 9.6 percent. Monroe's sales during 1940 increased 93.5 percent and the value of its sales increased 73.1 percent. Of its total of 89 sales only 15 were sold under the "Wilson Plan" so that even excluding those sales, defendant's number of sales increased 60.8 percent in 1940.

In 1941 the number of plaintiff's sales increased 74.7 percent and the gross value of his sales increased 87.7 percent. Monroe on the other hand increased the number of its sales only 13.5 percent and the gross value of its sales 28.4 percent; and it sold the same number of machines under the "Wilson Plan" that it had sold in 1940. Excluding those sales defendant suffered a decrease of 3.4 percent in the number of its sales.

In 1942 plaintiff suffered a decrease of 13.04 percent in the number of sales, but the value of those sales increased 4.3 percent. Defendant increased the number of its sales 31.7 percent although the gross value of those sales increased only 16.2 percent. Of its total of 133 sales in 1942 only 3 were made under the "Wilson Plan". So that excluding those sales the number of defendant's sales increased 28.7 percent.

An analysis of the figures for 1942 seems to reflect the higher prices of the Marchant models sold during that year. Plaintiff suffered a loss of 13.04 percent in number of machines sold but had a gross sales value increase of 4.3 percent. Defendant, on the other hand, increased its number of sales 31.7 percent but increased the gross value only 16.2 percent.

The figures further indicate that the percentage of discounts allowed by plaintiff on his gross sales steadily increased. In 1939 the discounts allowed amounted to 7.36 percent of the gross sales; in 1940, 8.07 percent; in 1941, 10.18 percent; and in 1942, 12.95 percent. This was an increase of 5.59 percent over the period.

Defendant's percentage of discounts remained more constant. In 1939 the discounts allowed amounted to 8.26 percent of the gross sales; in 1940, 7.06 percent; in 1941, 9.4 percent; and in 1942, 9.88 percent. This was an increase of 1.62 percent over the period. Furthermore, the difference between the lowest and highest percentages was 2.82 percent.

By this time the effect of the war had resulted in priorities being imposed on this type of equipment and the problem of the parties was not in finding buyers but in obtaining the machines and the priorities for their delivery.

The very considerable increase in the number of unit sales by defendant in 1942 and the decrease in unit sales of plaintiff may create some speculation or at least prompt one to wonder about probable causes. As heretofore stated, the war was on and its restrictions had been imposed. Whatever was available could be disposed of. Marchant manufactured about 6 models all priced slightly higher than defendant's comparable models. Defendant manufactured about 18 models ranging from a small portable desk model to the large sizes.

A further explanation may be found in the sales record of plaintiff during the whole period involved. During 1939 plaintiff had 9 salesmen and of the 76 sales made during the year plaintiff made 14, one salesman 19, another 17, and others 7, 6, 4, 4 and 3 respectively. In 1940 plaintiff had 6

---

[3] All calculations concerning Monroe's sales are based on its sales in the Kansas City Trade Area.

salesmen and of the 79 sales made plaintiff made 27, one salesman 17, another 11 and the others 10, 7, 4 and 3, respectively. In 1941 plaintiff had 3 salesmen and of the 133 sales made plaintiff made 97, and his salesmen made 16, 15 and 10 sales respectively. By 1942 his sales force had fallen to two salesmen who made 7 and 6 sales respectively of the 120 sales made. Plaintiff made 107 sales.

Summarized, the record discloses that plaintiff's personal efforts were increasingly productive as the years passed while those of his sales organization were decreasingly productive. Of the 413 machines sold during the period, plaintiff personally sold 245. The last year his salesmen made only 13 sales compared to his 107 while in the previous year his salesmen made 41 sales compared to his 97. In the light of these facts the difference in the number of sales for 1942 is readily understandable.

■■ From all the evidence I am unable to find where plaintiff has shown that he suffered any loss or damage to his business. He insists that the law does not demand of him positive proof of actual loss and that it is sufficient for him to show the unfair trade practices and that the Court may and should speculate as to damages. With this contention I am unable to agree. Plaintiff must show by the fair preponderance of the evidence that he has suffered loss. The fact of damage itself is not subject to speculation. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Roseland v. Phister Mfg. Co., 7 Cir., 125 F.2d 417, 139 A.L.R. 1013.

■ However, once the *fact* of damage has been proved, the Court has rather wide latitude in determining the amount of damages.

Plaintiff has not sustained the burden of showing damages through the allowance of discounts. For the Court to find from the available evidence that he was damaged, the Court would have to indulge in pure speculation, and that the Court cannot do. The finding and judgment must be for defendant.

It is so ordered.