John C. CENTANNI, etc.

v.

T. SMITH & SON, INC., Crescent Towing & Salvage Co. Inc., Terence J. Smith, William A. Smith, Jr., and James E. Smith.

Salvadore BERTUCCI, Elwin J. Bostick, Raymond R. Centanni, Paul Trapani, Joseph R. Trapani, Gaspar Trapani, Joseph O. Dufour and Louis Trapani

v.

T. SMITH & SON, INC., Crescent Towing & Salvage Co. Inc., Terence J. Smith, William A. Smith, Jr., and James E. Smith.

GEORGE W. WHITEMAN TOWING COMPANY

v.

T. SMITH & SON, INC., Crescent Towing & Salvage Co., Inc., Terence J. Smith, William A. Smith, Jr., and James E. Smith.

Civ. A. Nos. 9300, 10144, 10284.

United States District Court
E. D. Louisiana,
New Orleans Division.
April 5, 1963.

Amos L. Ponder, Jr., New Orleans, La., for plaintiffs.

Charles Kohlmeyer, Jr., and James A. Churchhill, New Orleans, La., for defendants.

CHRISTENBERRY, Chief Judge.

The foregoing matters having been tried to the Court without a jury, and having heard evidence and argument of counsel, and having taken time to consider, the Court has made the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I.

These three private treble damage actions, based upon identical allegations and filed by John C. Centanni, sole proprietor of the business known as Linesman Service Company, George W. Whiteman Towing, Inc., a Louisiana corporation the entire capital stock of which is owned by George W. Whiteman and/or his wife, and eight individual plaintiffs, were consolidated for the purpose of trial on the issue of liability. For convenience, the plaintiffs hereinafter will be referred to respectively as "Linesman Service", "Whiteman", and "the individual plaintiffs". All plaintiffs claim damages by reason of defendants' alleged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and § 3 of the Clayton Act (15 U.S.C. § 14).

### II.

The defendants are T. Smith & Sons, Inc. (T. Smith), Crescent Towing & Salvage Co., Inc. (Crescent), and Terence J. Smith, William S. Smith, Jr. and James E. Smith.

### III.

Linesman Service is engaged in the business of furnishing mooring and unmooring service to vessels in the Port of

New Orleans. For such services, it is paid a flat fee, to which there is added an hourly charge after one hour of waiting time.

Linesman Service came into being at least to some extent by reason of Mr. Centanni's position with Whiteman. For a number of years, Mr. Centanni has been and still is the office manager and dispatcher in Whiteman's office. His function, among others, is to receive orders for tugs from ships' agents and arrange for Whiteman's tugs to assist arriving, departing and shifting vessels. Thus he was in a position to know of the coming and going of all vessels for which Whiteman performed towage services, and it was a simple matter for him simultaneously to arrange for linesmen with respect to such vessels. For this purpose, he started the business of Linesman Service, and the successful solicitation of Whiteman's customers, as well as others, was commenced on a regular basis. Linesman Service paid no rent for office space and was operated by Mr. Centanni from his desk at the Whiteman office as well as from his home. The customers of Linesman Service were, in most cases, customers of Whiteman, and it appears that some firms in the shipping business in New Orleans were unaware that Linesman Service was a business completely separate and apart from that of Whiteman, since Mr. Centanni was also Whiteman's employee and operated his linesman business from the Whiteman office. Letters were written by Mr. Centanni to shipping companies soliciting business for both Whiteman and Linesman Service without distinguishing any ownership, and at least one such letter offered in evidence was written on Whiteman stationery.

### IV.

The individual plaintiffs formed the group which handled mooring lines, being paid on a piecework basis, with additional compensation in the event of overtime, overtime being time spent on the job in excess of one hour. The operation was very simple. The individual plaintiffs received telephone instructions from Mr. Centanni to meet ships at designated docks. The work consisted of tying up ships and casting off lines. No direct employer supervision was necessary and one of the linesmen routinely kept a time record for the men on the job. The individual plaintiffs had no contact whatsoever with any customer. They acted solely upon the orders of Mr. Centanni. Accordingly, all of the individual plaintiffs were employees of Linesman Service and not independent contractors. This finding is supported by the fact that Linesman Service in effect admits that the individual plaintiffs are employees, for it now maintains the records required by the Wage and Hour Division of the Department of Labor with respect to hours of work and minimum wages, covers them with compensation insurance, and withholds income taxes and social security contributions from their wages.

### V.

Whiteman is a comparatively new corporation, but George W. Whiteman and his father conducted a towing business in the harbor of New Orleans for many years. At the pertinent times herein, Whiteman owned several tugs and chartered others from George W. Whiteman individually. Some of the tugs are capable of deep sea towing, but for the most part their operations are confined to harbor towing. Until recently the tugs were not insured, they are generally quite old, are manned by fewer crew members than the Crescent tugs, and although unionized, the Whiteman personnel receive substantially lower wages than do comparable Crescent personnel.

### VI.

Crescent is the owner and operator of the largest fleet of tugs in the New Orleans harbor. Its equipment is modern, well maintained and fully insured. All the capital stock of Crescent is owned by members of the Smith family, which includes the individual defendants herein and their sister.

## VII.

T. Smith is engaged in the stevedoring business in the harbor of New Orleans. The stockholders of T. Smith are the same as those of Crescent and represent the third generation to own and operate the business, the predecessor of which was founded by their grandfather prior to the turn of the century. Terence J. Smith is President of each corporation. The three Smith brothers, all defendants herein, serve as directors of both corporations. T. Smith owns and operates a fleet of derrick barges used in salvage work and in the stevedoring business. Its equipment is modern, insured and fully crewed. Like Crescent, it is a successful company and enjoys an excellent reputation in its field.

## VIII.

In order to appreciate the current status of competition in the towing business within the harbor of New Orleans, it is necessary to review briefly its recent history. Prior to World War I, W. G. Coyle & Co., Inc. was the dominant towing company in the harbor, operating a large fleet of harbor and deep sea tugs and performing the major portion of the harbor towing in the Port. Following the war, Coyle found it was unable to obtain a return on its substantial investment commensurate with the risks involved, partially because of the intense competition it encountered from small independently owned tugs. For this reason, as well as others, Coyle sold its fleet and withdrew from the harbor towing business altogether. These small tugs which work on a "catch-as-catch-can" basis at rates far below those which large companies with substantial overheads are required to charge still abound in and about the harbor of New Orleans, and both Whiteman and Crescent have felt the effect of their competition. At the pertinent times involved herein, neither company could compete with these tugs in the shifting of barges in and about the harbor, and today this work is almost exclusively performed by small independently owned tugs, with the owner usually acting as master, with a deckhand or two.

Prior to World War II, the Smith interests did not engage in the towing business. During the war years, its derricks were in great demand and it was required to hire tugs to shift the derricks around the harbor. The War Shipping Administration awarded it the operation of several tugs, principally for the purpose of shifting its own equipment, but it was required also to use the tugs for handling harbor towing of vessels under its War Shipping Administration contract. As time passed, the business grew and Crescent was formed to take over the ownership and/or operation of all tugs, performing services for T. Smith as well as for steamship companies needing such services in the harbor. Thus the entry of Crescent into the towing business grew out of government requirements during the war years and gradually expanded into a full-fledged commercial venture.

## IX.

T. Smith went into the linesman service business in the following manner: For many years, the work of mooring and unmooring vessels had been carried on by casual labor, who were on the dock at the time vessels were being moored or unmoored. Until recent times, there were no organized linesman businesses as such. To serve its customers, T. Smith set up a division to perform this work. T. Smith charged approximately the same rate for the mooring and unmooring of a vessel as did Linesman Service. Its linesman business comprised only a small fraction of its total operations. In 1959, for instance, the gross revenues from lines work amounted to approximately $100,000.00, whereas the total stevedoring gross revenues amounted to approximately $10,000,000.-00.

## X.

Plaintiffs have charged defendants with conspiracy in restraint of trade, monopolization of various businesses, and, more specifically, with ille-

gal tying arrangements condemned by the anti-trust laws. It is alleged that T. Smith refused to perform derrick work for American Barge Lines unless American Barge Lines employed Crescent tugs for the shifting of its barges in the harbor. A further illegal arrangement is charged involving a compulsory tie-in between lines work performed by T. Smith and towing services rendered by Crescent with respect to the account of States Marine-Isthmian Agency, Inc. Finally, it is charged that T. Smith used its economic power in the stevedoring field to strengthen its position and eliminate competition in the towage and lines areas. None of these allegations has been proved.

## XI.

Asher Boudreaux, a retired fleet superintendent of American Barge Lines, testified that Mr. Steen, an employee of T. Smith, informed him some time in the period between 1950 and 1955 that when T. Smith's derricks were used by American Barge Lines, Crescent's tugs also had to be used. Mr. Boudreaux's testimony related to facts occurring in the years 1950 through 1955 and no later. The testimony of this witness is so heavily outweighed by the evidence adduced to rebut it that I cannot accept it as being accurate.

Mr. Steen testified that he had never had any conversation with Mr. Boudreaux, much less one in which he either suggested or demanded that the use of the Crescent tugs be tied to the T. Smith derrick operations. Other members of the Smith organizations testified equally clearly and unequivocally that there had never been a tie-in between any services rendered by the Smith-controlled companies. Transcripts of T. Smith's accounting records which were offered in evidence contain no identifiable charges to American Barge Lines for derrick services and clearly indicate that no tie-in could have existed.

Moreover, Terence J. Smith and George W. Whiteman agreed in their testimony that neither of their companies could compete with the small independent tugs, heretofore mentioned, for the business of shifting barges in the harbor. Almost all of the towing service which Crescent rendered to American Barge Lines consisted of moving barges in order to coordinate the discharging and loading of cargo from ships being stevedored by Smith. In other words, Crescent tugs were used when T. Smith was performing stevedoring operations. Such towing and stevedoring services were billed to and performed at the instance of the vessels receiving or discharging the cargo, and not at the request of American Barge Lines. Hence there would have been no occasion for and no possibility that American Barge Lines would have ordered derricks in such instances. Necessarily, no tie-in between derrick service and towing could have existed.

It is apparent that Whiteman could not have been deprived of American Barge Lines towing business by reason of an illegal tie-in, since it admittedly could not have competed with the small independent tugs for such business anyway. Plaintiffs have failed to establish that T. Smith possessed the economic power in the derrick business with which to force American Barge Lines to use Crescent tugs, even had it desired to do so. In short, the cases of all plaintiffs in this regard fall far short of success.

## XII.

The principal charge against the defendants arises out of transactions with States Marine Agency. Crescent is alleged to have acquired approximately one-half of the towing of States Marine vessels by means of an illegal tie-in with the linesman service of T. Smith. Plaintiffs contend that the towing service was obtained by Crescent through a promise that T. Smith would perform lines work for States Marine vessels at no charge. This charge is wholly unfounded.

Mr. Lloyd Estes, the local vice-president of States Marine, in charge of Gulf operations, who carried on all of the negotiations for his company, testified that

there was no connection between his decision to award Crescent a part of the States Marine towing business and the price of lines service offered by T. Smith. He clearly stated that the towing business would have been awarded to Crescent in the absence of any linesman service (or stevedoring) price concessions. The allegations of an illegal tie-in is further defective by reason of plaintiffs' failure to establish that T. Smith possessed the economic power with which to coerce customers into utilizing Crescent's towing service. Nor have plaintiffs shown that Crescent's acquisition of a portion of the States Marine account had the effect of lessening competition in the towing business in New Orleans. None of the evidence elicited in connection with this transaction indicates that States Marine was in any way coerced or offered any illegal or improper concessions in any of its dealings with the Smith enterprises. It was in the position of demanding concessions rather than bowing to conditions dictated by others.

## XIII.

In addition to the illegal tie-in allegations, plaintiffs have charged that T. Smith and Crescent constitute monopolies in their respective fields and, alternatively, that their conduct has amounted to an attempt to monopolize. Neither corporate defendant constitutes a monopoly and neither is guilty of an attempt to monopolize.

■ Plaintiffs have failed to prove that defendants have monopolized any market. It is alleged that T. Smith monopolizes the stevedoring business. The stevedoring business is not a relevant market in these proceedings, since none of the plaintiffs are engaged in the stevedoring business and no tie-in or improper use of coercive power has been proved in regard to stevedoring and any other business. Obviously, none of the plaintiffs could have been injured by a monopoly of a business in which they are not engaged in the absence of a compulsory tie-in or other facts not here relevant.

It is true that T. Smith utilizes derricks to some extent in performing stevedoring services and that Whiteman does own some derricks. However, there is no evidence tending to show that T. Smith even attempted to use its position in the derrick field to injure any of the plaintiffs or to procure any business from any customer of any plaintiff.

Even if the stevedoring market were relevant, T. Smith has not monopolized that market in the Port of New Orleans. It is concededly the largest independent stevedore in New Orleans, but it has not been shown to have used its position improperly, and it has substantial competition from other independent stevedores and from numerous so-called "house" stevedores. Into this latter category fall very large organizations formed by steamship companies to service vessels which they own or for which they act as agents. Included in this category are the stevedoring subsidiaries and affiliates of such companies as Strachan, Texas Transport & Terminal, United Fruit, and at one time States Marine. The total business performed by T. Smith as a stevedore formed only a minor percentage of the total business performed by all stevedores in the harbor during the relevant periods. Even if "house" stevedores are not considered competitors of T. Smith, T. Smith may nevertheless not be considered a monopoly and does not possess monopoly power in the stevedoring field, i. e., the power to drive out existing competition or to exclude new entrants from the field. In the early days of stevedoring, heavy investment in gear and equipment was required, whereas today a newcomer may enter the field simply by renting the necessary gear and equipment and charging the rental to the customer. Since the only requisite to entering the business is a customer, it is difficult, if not impossible, for anyone to preempt a substantial part of the market.

## XIV.

As before indicated, the derrick business is not a relevant market in the pres-

ent proceedings for the reason that no evidence other than that pertaining to American Barge Lines has been adduced tending to show that any of the plaintiffs were deprived of derrick or line service or towing business by reason of T. Smith's position in the derrick field. T. Smith neither possessed nor exercised monopoly power in the derrick field. Atlantic & Gulf Stevedores, New Orleans Coal & Bisso Towboat Co., and Whiteman are all independent derrick owners, the last named being principally engaged in the towing business. Their derricks, together with those of T. Smith, were and are available to any customers seeking derrick services in the harbor, and no proof of monopoly or attempt to monopolize or use economic pressure in this area is disclosed by the evidence.

### XV.

The charge of monopoly with respect to linesman service may be summarily disposed of. This business requires no equipment whatever. All that is necessary is that a steamship agent be communicated with, an order delivered, and the men directed to the proper wharf. No capital investment is required and any labor picked up at random can comprise a gang of four men to cast off lines or throw a spliced eye on a bollard. This is the extent of the linesman business and, obviously, entry into the field cannot be prevented by an "entrenched" participant. Unreasonably high rates would be penalized by the swift arrival of competition willing to do the job at a lower price.

### XVI.

Crescent does not enjoy a monopoly of the towing business, nor is there any evidence of incipient monopoly in this field. In addition to the many independently owned tugs in the harbor, Crescent has three strong competitors in New Orleans Coal & Bisso Towboat Company, E. N. Bisso and Whiteman. The competition is intense, as is evidenced by the testimony of George W. Whiteman to the effect that much of his existing business

was captured from Crescent by means of price cutting.

Furthermore, the area of competition is not confined geographically to the Port of New Orleans, since tugs from other harbors can move into New Orleans with ease in the event that New Orleans towing rates increase unreasonably. There is potential competition in this field from all other ports in the Gulf, and indeed, there is no apparent reason why tugs from New York City could not move to New Orleans if the rates of local towing companies became unreasonably high. It is, however, unnecessary to consider tugs from other localities when the history of the towing business in New Orleans indicates that an intense price competition has always existed between the local companies.

■ Crescent is admittedly the largest towing company in New Orleans, but it does not possess monopoly power and business conditions are such that it is unlikely ever to approach a position of illegal dominance. It is not unusual in the towing business that one company should grow to be larger, even substantially so, than its competitors in a given port, and yet the very nature of the business, as heretofore outlined, precludes the acquisition of monopoly power even by the largest of the operators. Mere disparity in size between competitors is not of itself even an indication of illegal monopoly power.

### XVII.

As before stated, the principal complaint in these consolidated cases arises from the diversion of approximately one-half of the States Marine-Isthmian towing business from Whiteman to Crescent and from the diversion of the States Marine linesman business from Linesman Service to T. Smith.

States Marine-Isthmian Agency, Inc., is one of the largest steamship operators in the Port of New Orleans. The company resulted from a combination of three steamship lines, at least one of which had connections with T. Smith for

many years. T. Smith has always been the independent contract stevedore of States Marine in New Orleans except during the period that States Marine was operating its own stevedoring company. Prior to August 1, 1959, Whiteman was performing all of the towing service for States Marine, and Linesman Service was performing all of the lines work for the company.

Mr. Lloyd Estes, vice president of States Marine, already mentioned herein, had several conferences with Mr. Terence J. Smith and members of his staff in connection with the handling of the States Marine work in New Orleans. The decisions were made solely by two individual negotiators—Mr. Smith and Mr. Estes. Mr. William S. Smith and Mr. James E. Smith took no part in the negotiations and were apparently unaware of the details of the arrangement until after August 1, 1959, when the States Marine account was shifted. After a substantial period of negotiating, it was determined that T. Smith would be given all of the linesman business and that Crescent would be given one-half of the towing business, effective August 1, 1959. T. Smith already had the States Marine stevedoring business under a contract which provided for a renegotiation of rates at the end of each calendar year in the event that an unreasonable or abnormal profit accrued to it from earnings at the commodity rates listed in the contract.

It was agreed between Mr. Smith and Mr. Estes that Crescent would meet the Whiteman towing rates in return for one-half of the States Marine towing business. It was separately agreed that T. Smith would perform linesman service for States Marine vessels in conjunction with its stevedoring without billing for such services. Mr. Smith testified that it was his intention in making this agreement to meet the Whiteman competition in both towing and lines work and that it was upon this basis that he sought the new business. Both he and Mr. Apgar, a vice-president of T. Smith, testified that they were unaware of the existence of Linesman Service or that its proprietor, Mr. Centanni, was engaged in the lines business. Both testified that it was their impression, until the present litigation arose, that the States Marine lines work, prior to the 1959 agreement, had been performed by Whiteman. They also testified that they were told by Mr. Estes that "Whiteman does not bill me for linesman service" or some such similar words. Consequently, it was Mr. Smith's understanding, reasonably arrived at, that in agreeing not to bill States Marine for linesman service, T. Smith was simply meeting the existing competition of Whiteman. Mr. Estes stated that he did not remember having made such a statement, but that he did not deny that such an impression could have been gained from him in the conversations leading up to the 1959 agreement. The trouble was, of course, that contrary to the impression given Mr. Smith and his staff, the States Marine lines work had previously been performed by Linesman Service at its regular rates.

In any event, T. Smith did not bill directly for the linesman service rendered by it to States Marine after August 1, 1959, but did include the cost of the service in its renegotiation figures submitted annually in connection with its stevedoring contract with States Marine. These figures formed the basis for determining whether or not an excessive profit had been earned on the stevedoring contract. No recovery of inordinate profits through the renegotiation of stevedoring rates was in fact ever necessary because the stevedoring business was not sufficiently profitable during that period to require such.

Crescent acquired one-half of the States Marine towing business by meeting the prices theretofore charged by its competitor, Whiteman, and States Marine, in awarding the business to Crescent, was motivated not by any concession received with respect to lines work, but rather, as Mr. Estes testified, from a desire to consolidate its business with a reputable organization which maintained adequate insurance upon its

equipment. T. Smith did not undertake to drive Linesman Service out of business by offering to perform free lines work for States Marine. No such intent can be ascribed to it when its officers were unaware of Linesman Service's existence. Furthermore, it is unlikely that such tactics would be employed in order to acquire a business which by its nature could not be particularly profitable or substantial in dollar volume when compared to the overall operations of T. Smith. It seems clear that T. Smith undertook to perform the linesman work for States Marine solely in order to provide as complete a maritime service for States Marine as possible. The lines work performed for States Marine by T. Smith cannot be considered as having been done free in view of the renegotiation provision of the stevedoring contract. But even if such service to States Marine could be considered free, this action was tantamount to the giving of a discount of approximately $40 (which was the amount of the usual mooring and unmooring charge) on each stevedoring bill that T. Smith rendered to States Marine. With few exceptions, T. Smith performed no lines service for States Marine vessels without also performing stevedoring services for such vessels. If the lines service arrangement is considered equivalent to a reduction in the price of stevedoring, such a price reduction was not made through any predatory motive on the part of T. Smith, but was solely a good faith effort to meet competition and accommodate a valued customer.

## CONCLUSIONS OF LAW

### I.

■ Even if the individual plaintiffs in Civil Action No. 10144 were to be held to have a cause of action, which I have found they do not, I conclude that they have no right of action against defendants under the antitrust laws. These plaintiffs are employees of Linesman Service and not operators of their own businesses or competitors of any of de-

fendants. As such, they have no standing in these proceedings. Martens v. Barrett, 245 F.2d 844 (5th Cir., 1957); Gerli v. Silk Ass'n of America, 36 F.2d 959 (S.D.N.Y.1929); Sargent v. National Broadcasting Company, 136 F.Supp. 560 (N.D.Cal.1955); Walder v. Paramount Publix Corporation, 132 F.Supp. 912 (S.D.N.Y.1955); Corey v. Boston Ice Co., 207 F. 465 (D.C.Mass.1913). Whether these individual plaintiffs are considered employees or independent contractors, and even if they had in fact suffered as a result of antitrust violations by the defendants, their interest is too remote to be actionable under the statute. Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907, 909 (D.Mass. 1956); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2nd Cir., 1955), cert. denied 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3rd Cir., 1956), cert. denied 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956), rehearing denied 355 U.S. 900, 78 S.Ct. 259, 2 L.Ed.2d 198 (1957); Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.C.Mass., 1957), affirmed 242 F.2d 758 (1st Cir., 1957), cert. denied 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957). Roseland v. Phister Mfg. Co., 125 F.2d 417, 139 A.L.R. 1013 (7th Cir., 1942) and McWhirter v. Monroe Calculating Machine Company, 76 F.Supp. 456 (W.D. Mo.1948) are not inconsistent with this conclusion, being distinguishable on their facts.

### II.

No evidence has been adduced to connect either William S. or James E. Smith with any of the acts complained of, and, accordingly, plaintiffs' case against these defendants must fail as a matter of law. Neither had any part in the States Marine transaction other than to execute the orders of their brother, Terence, once the arrangement had been concluded.

### III.

■ Defendants' dealings with States Marine and American Barge Lines, if

found to be as alleged (but not proved) did not involve illegal tying arrangements within the meaning of the Sherman Act. Plaintiffs failed, with respect to all tie-in allegations, to prove two essential elements of an illegal tie-in: (1) that defendants possessed monopoly power or, at the very least, a high degree of economic control in the market for the tying service, and (2) that the result of the tie-in was a substantial restraint upon competition in the market for the tied service. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Northern Pacific Railway Company v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). According to plaintiffs' allegations, towing was the "tied" service in the case of both tie-in allegations, whereas the derrick field was the "tying" service with respect to American Barge Lines and the linesman service business was the "tying" service with respect to the States Marine account.

The States Marine tie-in allegation is more fundamentally defective since the evidence clearly shows and I have found an absence of any causal relationship between the States Marine decision to award a portion of its towing business to Crescent and any concessions T. Smith may have made with respect to lines work. Since States Marine could have had either service separately, no tie-in existed. Northern Pacific Railway Company v. United States, 356 U.S. at p. 6, 78 S.Ct. at p. 518, 2 L.Ed.2d at p. 550 note 4. The essential element of customer coercion is lacking.

▮ The American Barge Lines tie-in charge is further defective for the reason that these actions were filed more than four years after the alleged events to which Mr. Boudreaux testified. Consequently, recovery is barred by the statute of limitations. Apart from this, even if Mr. Boudreaux's testimony is accepted, Whiteman was not deprived of any towing business it might otherwise have had since, by its own admission, it was not in a position to compete for the American Barge Lines business. The foregoing is further made academic by my finding as to Mr. Boudreaux's testimony.

## IV.

▮ Section 3 of the Clayton Act (15 U.S.C. § 14) has no application to the proceedings at bar since only services, and not the sale or lease of products, are herein involved.

## V.

▮▮ Plaintiffs have the burden of establishing that defendants possess monopoly power. Monopoly power is the power to control prices or exclude competition. United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Standard Oil of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Plaintiffs have clearly failed to show that T. Smith or Crescent possess monopoly power in any market, i. e., towing, lines work, derricks, or stevedoring. It is insufficient to show that defendants are the largest of the competitors in their respective spheres.

## VI.

▮ Defendants are not guilty of an attempt to monopolize within the meaning of § 2 of the Sherman Act. In order to prove such an attempt, plaintiffs must show that defendants had a specific intent to destroy competition and build a monopoly. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Plaintiffs must further prove conduct, on the part of defendants, "which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." American Tobacco Co. v. United States, 328 U.S. at 785, 66 S.Ct. at 1127, 90 L.Ed. at 1581 (1946).

Plaintiffs have proved neither of these essential elements and, indeed, all of the

evidence belies either an intent to drive plaintiffs out of business, or the possibility of monopoly, or incipient monopoly, in the Port of New Orleans.

## VII.

 No antitrust violation resulted from Crescent's acquisition of a part of the States Marine towing business by agreeing to meet Whiteman's prices. It is manifestly not illegal to meet competition. It is even permissible to cut a competitor's price in the absence of the prohibited intent, and as long as competition is not impaired. United States v. New York Great Atlantic & Pacific Tea Co., 67 F.Supp. 626 (E.D.Ill.1946), affirmed 173 F.2d 79 (7th Cir., 1959); Sunbeam Corp. v. Payless Drug Stores, 113 F.Supp. 31 (N.D.Cal.1953).