SOUTH CAROLINA COUNCIL OF MILK PRODUCERS, INCORPORATED, by and through its officers George Tupper and Walter Bell, Jr., individually and as representatives of all of the members of South Carolina Council of Milk Producers, Incorporated, Plaintiffs,

v.

Joseph T. NEWTON, Jr., et al., Defendants.

Civ. A. No. AC–1575.

United States District Court
E. D. South Carolina,
Columbia Division.

Heard Feb. 25, 1965.

Decided May 15, 1965.

Lynn C. Paulson, Washington, D. C.; Legare & Hare, Charleston, S. C.; and Murchison & West, Camden, S. C., for plaintiffs.

Hollings & Hawkins, Charleston, S. C., and Ellis T. Fernandez, Jr., Jacksonville, Fla., for defendants.

HEMPHILL, Chief Judge.

Originally instituted November 12, 1964, this action seeks relief to which plaintiffs allege entitlement, for damages and injunctive relief under provisions of the Clayton Act, (15 U.S.C. §§ 15 and 16) and the Sherman Act, (15 U.S.C. §§ 1 and 2), particularly 15 U.S.C. § 15.[1] In addition to treble damages demanded in the amount of $1,500,000, plaintiffs ask attorneys' fees, costs and injunctive relief. In substance plaintiff alleges:

"Beginning on or about January 1963 and continuing to the present time, defendants have been engaged continuously in a combination and conspiracy in restraint of trade and commerce in groceries and other items customarily sold in grocery stores, including milk and dairy products, in an attempt to monopolize trade and commerce in these commodities in violation of Sections 1 and 2 of the Sherman Act."[2]

In addition plaintiffs "spell out" the purported acts of violation.

Certain defendants plead:

"All of the defendants, *Except* the Defendants Commodore Points Terminal Corp. (Fla.) and Piggly Wiggly Corp. (Del.), move the Court under Rules 12, 17(a), and 56 of the

---

1. Which provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

2. 15 U.S.C. § 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: Provided, That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: Provided further, That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other." 15 U.S.C. § 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Federal Rules of Civil Procedure as follows:

"*FIRST*: To dismiss the action because the Complaint fails to state a claim against the Defendants upon which relief can be granted. Section 4 of the Clayton Act provides, "That any person * * * injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor * * *" * * * 15 U.S.C. § 15. However, since the remedy is extraordinary, the language, "any person * * * injured" has been strictly construed, and the availability of the remedy has been limited to persons who stand in some immediate or direct relationship to the violator. The Complaint fails to show on its face any direct relationship between the Plaintiff and these Defendants, but rather shows some farmers proceeding against an individual, a distributor, a wholesaler, and some retailers with whom the farmers have never been in privity of contract or in direct relationship, nor are the parties competitors.

"*SECOND*: To dismiss the action, because the Complaint fails to state a claim against these Defendants upon which relief can be granted. All of the acts complained of as being anti-trust violations are acts affecting milk which is regulated by the South Carolina Dairy Commission. These same Defendants were attacked by these same Plaintiffs in conspiracy with others on the same charges of obtaining a dairy, and then producing, distributing, and selling milk at a substantially reduced price. The Dairy Commission, as a result, promulgated Regulation 4(I), providing that milk could not be sold below cost. Thereupon, numerous hearings were held before the Commission and the Courts, and a determination made that the milk prices of these Defendants were above cost,

reasonable, and not injurious to the public.

"That said pricing practices of these Defendants were imposed by the State as an act of government; and while regulated industries are not per se exempt from the anti-trust laws, the restraint, if any, as alleged in the Complaint, is not prohibited by the Sherman Act.

"*THIRD*: To dismiss the action of the South Carolina Council of Milk Producers, Incorporated, and its representative action, on the grounds:

"a. Its Complaint fails to state a claim against these Defendants upon which relief can be granted, because fundamental to a treble damage suit is the element of injury to the Plaintiff's business or property and the Complaint shows on its face that the Council is a non-profit association, has no business or property to be injured, and none is alleged; that a private association cannot bring suit for violations it merely observes, for this function is within the sole province of government agencies.

"b. That the Council is not the real party in interest, for the Complaint shows on its face that the injury, if any, is not that of the Council and it cannot bring suit for damages to its members alone.

"c. That the Council is not the real party in interest in that the Charter of the Council limits membership to producer associations and the Complaint shows on its face that the injury, if any, is to individuals.

"*FOURTH*: To dismiss the action under Section 3 of the Robinson-Patman Act for a civil action will not lie under this section."

Attached, and made Appendix I of this Order are Articles II, III, VII, and VIII of Plaintiffs' Charter application as exhibit to substantiate. Also attached to and made a part of the motion as exhibits and to substantiate were an affidavit of counsel as to previous pursuing proceed-

ings,[3] Articles of Incorporation of South Carolina Council of Milk Producers Association, and Certificate of Charter Amendment of May 12, 1964 changing charter name of South Carolina Council of Milk Producers Association to South Carolina Council of Milk Producers.

Subsequently remaining defendants moved to dismiss, in language:

"The Defendants, Piggly Wiggly Corporation, a corporation of Delaware, and Commodore Point Terminal Corp., by their undersigned attorneys, respectfully move the Court for the entry of an Order herein dismissing this cause and Plaintiff's Complaint as to said Defendants upon the following grounds, severally, to-wit:

"1. Said Complaint fails to state a cause of action as to those Defendants upon which the relief therein prayed can be granted by reason of each, both or either one of the following:

"(a) Article VII of the Charter of the Plaintiff, a copy of which is hereto attached, provides that membership in the Plaintiff South Carolina Council of Milk Producers shall be restricted to cooperative associations of milk producers. The individual "members" named in the Complaint purport to act in their own behalf and in behalf of a class, to-wit: All of the "members" of the Plaintiffs South Carolina Council of Milk Producers. Since the Plaintiff South Carolina Council of Milk Producers is alleged in the Complaint to be a non-profit member corporation, it is axiomatic that neither the provisions of the Clayton Act (15 U.S.C. Sections 15 and 16) nor of the Sherman Act (15 U.S.C. Sections 1 and 2) are available to it. Hence, proper Parties Plaintiff, as alleged in the Complaint, either do not exist or are repugnantly and improperly joined to create a fatally defective multifariousness.

"(b) Said Complaint fails to state with sufficient particularity any act or action either of omission or commission by which these Defendants, or either of them engaged in any conspiracy to the detriment of the Plaintiffs or anyone.

"2. Said Complaint fails to state a cause of action as to these Defendants upon which the relief therein prayed can be granted by reason of those grounds severally alleged in the Notice of Motion and Motion to Dismiss filed herein by the other Defendants. By this reference, said grounds are specifically adopted by these Defendants as additional grounds for this Motion."

It appearing that the first motion to dismiss, as set out in the second paragraph of this Order, covers all the relevant issues in dispute, only that motion will be discussed.

## I

The first basis for defendants' motion is that there is no showing or allegation of a direct relationship, within the contemplation of the anti-trust laws, between plaintiffs and defendants, i. e., plaintiffs are producers of raw milk and defendants engage in practically every other activity involving milk and dairy products *except* production of the raw product. Averred is lack of privity of contact, direct relationship, or mutual competition.

This is defendants' strongest point and is successfully dispositive of the motion, which must be granted.

Inquiry here goes to the question of "directness." The first judicial discussion of directness, i. e., that the loss not be derivative, can be found in Loeb v. Eastman Kodak Co., 183 F. 704, 709 (3rd Cir.1910). There a shareholder-creditor-employee of a photographic supply house driven into bankruptcy by prohibited conduct was denied recovery in any of these capacities. His injuries were considered too remote within the contempla-

---

3. Attached and made Appendix II of this order.

tion of the Act, the Court saying that "before bankruptcy a right of action, of the character in question, resided * * in the corporation, and subsequent to bankruptcy * * * it resided in the trustee."

The Loeb doctrine has been interpreted to require that the plaintiff have direct relations (be in privity of contract) with the wrongdoer, and has been used as an effective bar to suits by shareholders,[4] officers,[5] employees,[6] and creditors,[7] for personal losses caused by injury to the corporation. The cause of action accrues only to the corporation for which it can bring suit, or by a shareholder's derivative suit.

■ Despite the broad language of the Act, a person does not have a cause of action when his losses are caused by an interruption or diminution of profitable relations with the party directly affected, the party in privity. Snow Crest Beverages, Inc., v. Recipe Foods, Inc., 147 F.Supp. 907 (D.Mass.1956); Volasco Prod. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir.1962), cert. den., 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed. 2d 717 (1963); Automatic Radio Mfg. Co. v. Ford Motor Co., 35 F.R.D. 198, 199 (D.Mass.1964) (Dictum). Note also the excellent and thorough discussion of standing to sue in 64 Columbia Law Rev. 570 (1964), from which this Court has paraphrased generously.

■ It has been argued that the decision of Karseal Corporation v. Richfield

Oil Corporation, 221 F.2d 358 (9th Cir. 1955), permitting recovery by the plaintiff who was not in privity with the defendant, was unaffected by Snow Crest, decided in 1956. However, the effect is the same, for competitors of the violator are typically considered to be in privity for the purposes of Section 4 of Clayton. Karseal, a manufacturer of automobile polish, complained that it was unable to make sales to service stations that had entered into exclusive dealing arrangements with the defendant. Karseal sold its polish through independent distributors rather than its own salesman, and the defendant contended that as a consequence Karseal was not in privity with the wrongdoing service stations. However, the Court reasoned that Karseal was "aimed at" with enough precision to entitle it to maintain a treble damage suit, reasoning that the exclusive dealing contracts were aimed at excluding competing products, and thus competing manufacturers, from the market. 221 F.2d at 362.

Karseal and Snow Crest can be differentiated then as follows:

a. In Snow Crest plaintiff manufactured and sold extracts which were used as a major ingredient in the manufacture of beverage syrup, whereas the defendant manufactured and sold syrup. In Karseal the plaintiff and the defendant handled the same product—automobile polish.

b. In Snow Crest the plaintiff, accordingly, was not in competition with the

4. Note Bookout v. Schine Chain Theatres, Inc., 253 F.2d 292 (2nd Cir. 1958); Peter v. Western Newspaper Union, 200 F.2d 867, 872 (5th Cir. 1953); Gerli v. Silk Ass'n of Amer., 36 F.2d 959 (S.D.N.Y.1929); Martens v. Barrett, 245 F.2d 844 (5th Cir. 1957); Skouras Theatres Corp. v. Radio-Keith-Orpheum Corp., 193 F.Supp. 401, 407 (S.D.N.Y.1961); Snow Crest Beverages, Inc., v. Recipe Foods, Inc., 147 F.Supp. 907 (D.Mass. 1956); Westmoreland Asbestos Co. v. Johns-Manville Corp., 30 F.Supp. 389 (S.D.N.Y.1939), aff'd, 113 F.2d 114 (2nd Cir. 1940); Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. den., 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963).

5. Sargent v. N. B. C., 136 F.Supp. 560 (N.D.Cal.1955); Gerli v. Silk Ass'n of America, supra note 4; Corey v. Boston Ice Co., 207 F. 465, 466 (D.Mass.1913).

6. Gerli v. Silk Ass'n of America, supra note 4; Centanni v. T. Smith & Son, Inc., 216 F.Supp. 330, 338 (E.D.La. 1963), the Court there noting: "These plaintiffs are employees of Linesman Service and not operators of their own businesses or competitors of any of defendants. As such, they have no standing in these proceedings."

7. See Gerli v. Silk Ass'n of America, supra note 4.

defendant, whereas in Karseal the plaintiff and the defendant were in competition even though not in privity.

■ These substantial differences remain in the case at bar. The plaintiffs and the defendants handle different products—the plaintiffs produce raw milk; the defendants use this ingredient as the major ingredient in the manufacture of pasteurized, homogenized, Vitamin D fortified, Grade A, Class 1, packaged milk. As a consequence, the plaintiffs and the defendants, as in Snow Crest, are not in competition and not in direct relationship. Moreover, other differences exist. There was an exclusive dealing agreement in Karseal. In the case at bar there is no exclusive dealing agreement; but, rather, the defendants sell competitors' products, and some of the defendants do not even handle the milk of the co-defendant Paradise. Finally, the competitive practice has different aims. In the Karseal case competitive practice was aimed at the defendant-competitors. In the case at bar the competitive practice of Paradise is aimed at the retail door-to-door distributor-competitor—not at the plaintiff farmers.

■ Any doubt that directness of injury is fundamental to a suit was laid to rest by the Sixth Circuit in 1962 in Volasco Products v. Lloyd A. Fry Roofing Company, 308 F.2d 383, supra. There recovery was denied plaintiff-supplier because the injury was not "direct", but this issue was not contested with respect to plaintiff-competitor, whose right of action was affirmed. The Court noted at page 395:

"It is well established in the law that a supplier is too remote and too far removed from the direct injury to recover damages resulting from violation of the anti-trust laws directed against the supplier's customer."

Volasco was appealed in 1963 to the United States Supreme Court, which denied certiorari. See note 4. The pleadings show on the face that the plaintiffs-suppliers' customers are various distributors not party to the present proceeding. The defendants are competitors of these non-party distributor-customers of the plaintiffs-suppliers. Assuming that the defendants are in conspiracy and are restraining trade, to paraphrase Volasco:

"It is well established in the law that the plaintiff-farmer-supplier is too remote and too far removed from the direct injury to recover damages resulting from violation of the anti-trust laws directed against the plaintiff-farmer-supplier's customer."

II

Though it has been concluded that defendants' motion to dismiss should be granted, the other grounds will be discussed to avoid piecemeal disposition and so that all the parties can better ascertain exactly where they stand.

Defendants' second ground to dismiss is that the prices are regulated by the State of South Carolina by an appropriate administrative agency, the South Carolina Dairy Commission. Note the affidavit of counsel which is attached as Appendix II.

From this affidavit, which plaintiffs do not dispute, it seems as a matter of "substantial justice" that defendants are doing everything they can to obey the law. They are selling milk above cost, they are making a profit, and even more importantly, they have obeyed the dictates of the State administrative procedures. They have run the entire State administrative and judicial gauntlet. The word "exhaustion" is used in some cases.

■ Nevertheless, this is not a sufficient basis to dismiss or perhaps to invoke summary judgment. See Automatic Radio Mfg. Co. v. Ford Motor Co., 35 F. R.D. 198 (D.Mass.1964). And, as the Supreme Court noted in 1945, "Regulated industries are not per se exempt from the Sherman Act." State of Georgia v. Pennsylvania R. Co., 324 U.S. 439, 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051; reh. den., 324 U.S. 890, 65 S.Ct. 1018, 89 L.Ed. 1437, 58 C.J.S. Monopolies § 25; Cf., Eastern Railroad Conference v. Noerr

Motors, 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464. Accordingly, as a matter of law, this basis to dismiss is not sufficient.

### III

Defendants' third ground, namely that there is a defect in the parties plaintiff, is valid, though the defect is curable if there be standing to sue.

 From the record before the Court it appears beyond peradventure that the cooperative is a non-profit making corporation.[8] How can a non-profit making corporation suffer injury to its business? The term "profit" seems inextricably tied up with the word "business." A cooperative or trade association must show that the claim asserted is the organization's. The plaintiff must be the real party in interest. Rule 17(a), Fed.Rules Civ.Pro.; Farmers Co-op Oil Co. v. Socony-Vacuum Co., 133 F.2d 101, 103 (8th Cir.1942). There is no showing whatever that the individual members of the association have assigned whatever cause of action they may have to the association.

For purposes of the motion, admitting *arguendo* that a valid cause of action exists, it seems that the *only proper* parties are the two officers of the association who brought the action in their own name, assuming damage, proximate cause, etc. There does not seem to be any authority for them to bring an action in a representative capacity. They are only a "real party in interest" for themselves.

 This so-called defect in the parties is not a determinative aspect of this matter, because of the liberality implicit in Rule 20, Fed.Rules Civ.Pro. See United States v. Carolina Warehouse Co., 4 F.R.D. 291, 293 (W.D.S.C.1945). Thus, it would seem that the individual farmers, members of the association, would be permitted to join, in accordance with Rule 20, again assuming for purposes of discussion that they had a cognizable cause of action.

8. The Charter of plaintiff association states: "This association shall be organized and operated on a non-profit coopera-

### IV

 Defendants' motion to dismiss, alleging nonapplicability of Section 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, is meritorious.

The Complaint alleges that defendants' activities "has caused milk and milk products to be sold in many markets in the State of South Carolina at unreasonably low prices contrary to * * * Section 3 of the Robinson-Patman Act, making it a criminal offense to sell at unreasonably low prices to suppress competition or eliminate a competitor." Plaintiffs contend that the interdictions of Section 3 "are to be considered in determining violations of the Sherman and Clayton Acts." Plaintiffs cite as authority therefor Moore v. Mead's Fine Bread Co., 348 U.S. 115, 119, 5 S.Ct. 148, 99 L.Ed. 145.

Mr. Justice Harlan, speaking for the Supreme Court in Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340, stated:

> "[I]t seems plain that the rule *expressio unius exclusio alterius* is applicable, and that the definition contained in § 1 of the Clayton Act is exclusive. Therefore it is of no moment here that the Robinson-Patman Act may be colloquially described as an 'antitrust' statute. And since no one claims that § 3 of the Robinson-Patman Act can be regarded as an amendment to the Sherman Act or the Wilson Tariff Act, the precise issue before us is whether Congress made that section of the Robinson-Patman Act a part of the Clayton Act, thus making it one of the 'antitrust laws' whose violation can lead to the private causes of action authorized by §§ 4 and 16. For the reasons stated below we hold that this is not the case."

355 U.S. at 376, 78 S.Ct. at 354. See also page 382, 78 S.Ct. page 357. A like result was reached in Safeway Stores, Inc.

tive basis * * *." See Appendix I, infra.

v. Vance, 355 U.S. 389, 78 S.Ct. 358, 2 L.Ed.2d 350, decided the same day.

See also Gold Fuel Service, Inc. v. Esso Standard Oil Co., 306 F.2d 61, 62 (3rd Cir.1962) where Judge Hastie pointed out:

"Appellant predicates its claim upon three separate provisions of the federal statutes. Its first contention is that a civil cause for violation of an 'antitrust law' arises out of Esso's sale of fuel oil in competition with appellant at an unreasonably low price in violation of Section 3 of the Robinson Patman Act * * *. However, as a matter of law the contention that a civil antitrust claim can arise in this way is contrary to the holding of the Supreme Court in Nashville Milk Co. v. Carnation Co., 1958, 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340. Therefore, an inferior federal court must reject this theory of liability."

By the same token, this Court must reject plaintiffs' theory of liability on this basis as well.

Defendants' motion to dismiss should be granted for the reasons given above. Accordingly, defendants' motion is granted.

Judgment will be entered with costs to follow.

And it is so ordered.

## APPENDIX I

## ARTICLES OF INCORPORATION

### OF

## SOUTH CAROLINA COUNCIL OF MILK PRODUCER ASSOCIATIONS

\* \* \* \* \* \*

### Article II—Purposes

The purposes for which this association is formed shall be:

(1) To coordinate the efforts of milk producers in building and maintaining a sound market for dairy products.

(2) To direct producer effort toward the bringing about of an adequate supply of locally produced milk of the highest quality to meet the needs of the consumers at all times.

(3) To participate in all projects designed to promote the sale and consumption of dairy products at a higher level.

(4) To effectively move surplus milk so that it will bring the producer the best return and at the same time avoid the possibility of breaking down local market prices.

(5) To provide factual information on marketing trends, future developments, and changes in marketing conditions to enable producers to meet their rapidly changing problems.

(6) To foster and promote a harmonious and close relationship between producers and distributors, consumers, institutions and other groups interested in the growth and welfare of the dairy industry in South Carolina.

(7) To improve the relationship between milk producers and the general public by providing factual information for a better understanding of the complex problems of the dairy industry.

(8) To perform any other service which may be mutually agreed upon by the members and which is in conformity with the act under which the association is incorporated and amendments thereto.

### Article III—Powers

This association shall exercise and possess all the rights, powers, and privileges necessary or incident to the purposes for which this council is organized or to the activities in which it is engaged, and in addition thereto any other rights, powers, and privileges conferred on cooperative associations of this kind by the act under which it is incorporated and amendments thereto and any other rights, powers, and privileges granted by the laws of the State of South Carolina to ordinary corporations except such as are

inconsistent with the express provisions of the Cooperative Marketing Act of South Carolina as amended, and to do any such things anywhere; and the enumeration of the foregoing powers shall not be held to limit or restrict in any manner the general powers which may by law be possessed by this corporation, all of which are hereby expressly claimed.

\*　　\*　　\*　　\*　　\*　　\*

### Article VII—Membership

This association shall not have any capital stock, but shall admit applicants to membership in the association upon such uniform conditions as may be prescribed by the board of directors of the association, or in its bylaws. This association shall be operated on a cooperative basis for the mutual benefit of its members as producers, and membership in the association shall be restricted to cooperative associations of milk producers. Voting rights in the council shall be in proportion to the number of producers belonging to the member association, as set forth in the by-laws of the council. The property rights and interests of each member association shall be unequal: and shall be determined and fixed in the proportion that the patronage of each member association shall bear to the total patronage of all the members with the council, but in determining property rights and interests all amounts allocated to each patron or evidenced by certificates of any kind shall be excluded. New members admitted to membership shall be entitled to share in the property of the association in accordance with the foregoing general rule.

### Article VIII—Non-Profit

This association shall be organized and operated on a non-profit cooperative basis for the mutual benefit of its patrons as producers. Therefore, at the end of each fiscal year, net margins and/or proceeds as shown by the annual report of the auditors shall be allocated as set out in the association's by-laws and each patron shall be notified of his allocation.

## APPENDIX II

### AFFIDAVIT

PERSONALLY appeared FALCON B. HAWKINS, who, being duly sworn, deposes and says:

That during the period involved, from January 1963 until the filing of the Complaint of the within proceeding in November 1964, he served as one of the attorneys involving the parties in the milk dispute;

That, upon information and belief, the Defendants, Newton and other individual proprietors of various Piggly Wiggly Stores, purchased the Paradise Dairy of Orangeburg in January 1963; renovated said dairy with new equipment during February and March of 1963, engaged additional South Carolina farmers to furnish milk for the dairy, and in April 1963 commenced selling milk above cost to the Piggly Wiggly Stores and competitors on an equal basis; that this was done after numerous unsuccessful efforts had been made to obtain a wholesale price for milk from various dairies in South Carolina; that said dairies refused said wholesale price and fixed the price to the Defendant stores at a level that required the stores to sell to the consumer at the same price as the dairies were selling to the consumer by door-to-door delivery.

That after the Piggly Wiggly Stores commenced selling milk above cost, the Dairy Commission called a public hearing, declared the dairy industry threatened with economic chaos, and, as a result, on May 1, 1963, promulgated Regulation 4(I), mandating that milk could not be sold at less than cost; that, thereupon, Paradise requested a hearing by the Dairy Commission to determine its cost; that the Commission countered that it would give a hearing only after Paradise had been audited; that Paradise agreed to this audit, which was conducted by the Dairy Commission accountants on May 7, 8 and 9, 1963, at Orangeburg; and that on the evening of May 9th, the Commission withdrew its auditors on a disputed basis; i. e., the Commission contending the records were insufficient, and Paradise contending the Commission was at-

tempting to delay; that, thereupon, Paradise, on May 10th, motioned the Commission before Judge Louis Rosen, returnable May 15th, asking among other relief for an Order to require the Commission to grant Paradise a hearing; that Paradise made it clear that it would abandon the Judge Rosen proceeding if the Commission would grant it a hearing; that the Commission then expressed its desire to inspect the records of Piggly Wiggly Wholesale, Inc., in Charleston, which was granted; and the Commission's auditors conducted such inspection on Monday, May 13th. However, the Commission refused to grant a hearing, and so Judge Rosen on May 15th ordered the Dairy Commission to give Paradise a hearing; that this hearing was held on May 22nd and 23rd, 1963, resulting in a 5–3 decision by the Commission on May 27th of a cost of 48¢ for a half gallon of milk. Paradise appealed this decision, and the Piggly Wiggly Stores, on May 25th, obtained an Order from Judge J. B. Pruitt to allow the stores to sell milk at a competitive cost. Thereupon, on June 11th, the Commission motioned Paradise, the Piggly Wiggly Stores, and others before the Supreme Court of South Carolina asking the Court to take Original Jurisdiction and again alleging, inter alia, injury to the within Plaintiff farmers. The Supreme Court refused Original Jurisdiction on June 13th. Conferences were held between counsel for Paradise and the Commission, and it was agreed that the Commission should choose auditors; Paradise would be subjected to a thorough audit, and then a hearing granted; and pending a finding of the cost of Paradise the dairy would raise its prices to the non-competitive level fixed by its competitor dairies prior to April. The Commission chose Price-Waterhouse of Chicago as auditors, and also retained Dairy Services, Inc. of Lexington, North Carolina as the dairy analyst. An extensive audit was made during the month of July and the first part of August, and upon completion the Commission conducted a hearing on August 6th and 7th, and thereafter, by Order of August 23rd, refused to determine a cost for Paradise. This

was appealed, and Judge John Grimball of the Court of Common Pleas conducted numerous hearings in October, November and December, and then determined by Order of December 18th a cost for Paradise for one-half gallon of milk at 41.767¢. Paradise has continued to sell at a price above this cost since. However, the Dairy Commission, in an attempt to contravene the order of Judge Grimball of December 18, 1963, issued its own Order of December 27th requiring Paradise to submit to a new hearing, which was conducted on January 17, 1964, and on January 28th the Commission ordered the new price for a half-gallon of milk to be 46.664¢, stating, " * * * The Commission hereby considers that this price determination supersedes and replaces the determination of the Court in the Order of December 18, 1963." However, Judge Grimball, by Order of March 11, 1964, terminating the appeal of the Commission from his Order of December 18, 1963, stated, " * * * the Order of this Court of December 18, 1963, is in full force and effect." The Commission then countered with a request for a restraining Order against Paradise before Judge Grimball, which by Order of March 23, 1964, was denied; and again Judge Grimball stated, " * * * the Order of this Court affecting the parties dated December 18, 1963, is in full force and effect." Paradise appealed the Commission's finding and order of January 28th, which on March 31st came on before Judge Grimball, who was faced not only with determining the merits of the appeal, but obviously confronted with the practical problem of terminating the legal maneuvers of the Dairy Commission to thwart due process. Evidently, the Judge determined to withhold the Order as the best maneuver to end maneuvers, for finally, on December 2, 1964, the Judge stated, in reversing the Order of the Dairy Commission of January 28th, " * * * it is apparent that the Dairy Commission has attempted to change the December 18, 1963, Order of this Court without the necessary factual basis for so doing. This cannot be permitted."

That at the initial hearing before the Dairy Commission on May 22, 1963, the

present principal Plaintiff, George Tupper, President of the South Carolina Council of Milk Producers, sat as a Commission member; and the South Carolina Dairy Association of over 300 dairy farmers who, on information and belief, comprise a majority of the Plaintiffs, were also represented by counsel who participated in the hearing. Later, the Coastal Milk Producers Association, which, upon information and belief, comprise a substantial number of the present Plaintiffs, was represented by counsel and participated in the second Dairy Commission hearing on August 6 and 7, 1963. The principal Plaintiff, Tupper, was then President of the Coastal Milk Producers Association, and over the objection of these Defendants refused on motion to disqualify himself, and participated as a Commissioner hearing his own case. Again, in the hearings before Judge Grimball, the South Carolina Dairy Association and the Coastal Milk Producers Association, the membership of which comprises, upon information and belief, the majority of the Plaintiffs, were represented by counsel and participated in the hearings. That, thereafter, at the hearing before the South Carolina Dairy Commission on January 17, 1964, the principal Plaintiff, Tupper, participated, over the objection of the Defendants, and refused on motion to disqualify himself. That at each stage of the proceeding, whether before the Commission, the *Supreme Court*, or the *Circuit Judges*, the issues of price discrimination and the alleged for injury to the present Plaintiffs were considered, and at every stage it was conceded by the Plaintiff, Tupper, the majority of the present Plaintiffs, and Counsel, and the Dairy Commission that Regulation 4(I), preventing sales below cost, would prevent injury to the dairy farmer and eliminate discriminatory or monopolistic practices in the dairy market.

That Regulation 4(I) was promulgated, and the Court has held that these Defendants' sale of milk during the period in question has been pursuant to State-imposed pricing and practices.