368 F.2d 679
 SANITARY MILK PRODUCERS, Clarence B. Palmer, Karl B.
Althage, R. D. Pennewell and Russell E. Spaulding,
Appellants,
v.
BERGJANS FARM DAIRY, INCORPORATED, Ozark Dairy Company,
Incorporated, Patke Farm Dairy, Incorporated, The Dairy
Maids, Incorporated, The North Hills Dairy Company,
Incorporated, and Woodlawn Farm Dairy Company, Incorporated,
Appellees.
 No. 18119.
 United States Court of Appeals Eighth Circuit.
 Nov. 10, 1966.
 
 Wilburn A. Duncan and Wayne B. Wright, St. Louis, Mo., for appellants.
 Veryl L. Riddle, of Riddle, O'Herin & Newberry, Malden, Mo., and Gray L. Dorsey, Chesterfield, Mo., for appellees.
 Before JOHNSEN and BLACKMUN, Circuit Judges, and YOUNG, District judge.
 BLACKMUN, Circuit Judge.
 
 
 1
 In August 1962 the six plaintiffs, appellees here, which are incorporated small dairies in the Saint Louis area, instituted this private action in four counts seeking treble damages and injunctive relief against Sanitary Milk Producers, Inc., a dairy-farmer cooperative, four of Sanitary's officers and directors, and four retail organizations, for alleged violations in 1962 and 1963 of the Sherman and Clayton Acts as amended, 15 U.S.C. 1, 2, 13(a), 15 and 26. Sanitary counterclaimed. Prior to trial the plaintiffs dismissed the suit as to the retailers.
 
 
 2
 The case came to trial in 1965. The damage issue was submitted to a jury and resulted in verdicts in favor of the six plaintiffs on the first, second and fourth counts of their complaint (conspiracy to fix prices of fluid milk in restraint of trade; attempt to monopolize; unlawful price discrimination) but in favor of the defendants on the third count (conspiracy to monopolize). The jury found against Sanitary on its counterclaim. Damages were awarded the several plaintiffs in the aggregate amount of $38,500. This, when trebled, resulted in a total monetary judgment of $115,500. The court allowed the plaintiffs attorneys' fees aggregating $12,850 and granted injunctive relief for a period of ten years, Judge Meredith's memorandum containing the findings and conclusions as to the court's aspect of the case is reported as Bergjans Farm Dairy Co. v. Sanitary Milk Producers, 241 F.Supp. 476 (E.D.Mo.1965). Reference is made to that memorandum for background and much of the pertinent factual material.
 
 
 3
 The defendants complain here primarily of (a) rulings on evidence; (b) the standing of two of the plaintiffs to sue; and (c) instructions and the sufficiency of the evidence.
 
 
 4
 A. The evidentiary rulings, claimed to justify a new trial, relate to (1) an inquiry made of witness Schwarz; (2) a letter written by an attorney for Adams Dairy; (3) references to Adams' bottling costs and to rumors about Sanitary; and (4) plaintiff Ozark's complaint in another antitrust action.
 
 
 5
 1. The Schwarz inquiry. William Schwarz is a member of the family which owned and operated the milk processing plant of Quality Dairy of O'Fallon, Illinois. Sanitary purchased that plant about December 1, 1961, but kept the three Schwarz sons active in its operation. William was manager and responsible to individual defendant Spaulding. At the time of the purchase, OFallon milk was sold through certain outlets in Saint Louis. Schwarz, however, then negotiated the introduction of O'Fallon milk under private label in additional Saint Louis outlets to begin February 27, 1962. When this became known, competitors reacted and a severe price war developed. Judge Meredith's description of the course of that conflict appears at pp. 479-480 of 241 F.Supp. In May Sanitary raised its wholesale price as billed to its outlets. Schwarz, however, then began to give the outlets cash rebates in paper envelopes. These payments were reflected as advertising expense on Sanitary's books.
 
 
 6
 Schwarz was called by the plaintiffs as an adverse witness. He was examined vigorously and in detail about this rebate practice. In the course of that examination by plaintiffs' counsel the following took place:
 
 
 7
 'Q. Mr. Schwarz, isn't it a fact that you knew it was a Federal crime to give cash rebates--
 
 
 8
 'Mr. Duncan: Your Honor--
 
 
 9
 'Mr. Riddle: (Continuing)-- discriminatorily to certain of your customers. Didn't you know that at the time?'Mr. Duncan: Your Honor, I object to the form of the question. There is no crime charged here, there is no proof that it is a crime. I think it is highly inflammatory and I ask Your Honor for a mistrial in view of that question.
 
 
 10
 'The Court: The Court will sustain the objection as to the question and I will instruct the jury to disregard it. I will deny your motion for mistrial.'
 
 
 11
 The defendants argue that irreparable harm resulted from this exchange; that this was an insinuation of the commission of a federal crime; that this is guilt by accusation; that the question was unjustified and devastating; that it poisoned the minds of the jury; that it unfairly obscured the defendants' contention that the rebates were made to meet competition, were not secret and were justified; that the situation was made worse by similar inferences of crimes under state law; and that the court's refusal to grant a mistrial was error.
 
 
 12
 An unsupported inference of crime by a witness or party to a civil action is improper cross-examination. Cohen v. Checker Taxi Co., 217 F.2d 449, 452 (7 Cir. 1954); Carr v. Standard Oil Co., 181 F.2d 15, 17 (2 Cir. 1950), cert. denied 340 U.S. 821, 71 S.Ct. 52, 95 L.Ed. 603; See Sanford v. United States, 69 App.D.C. 44, 98 F.2d 325, 327 (1938). It is improper, too, as against the defendant who takes the stand in a criminal case, for only actual conviction of a felony, or the like, and not just accusation or arrest is an appropriate attack upon the witness' credibility. 'What is forbidden is essential unfairness'. Schwab v. United States, 327 F.2d 11, 16 (8 Cir. 1964); United States v. Yarbrough, 352 F.2d 491, 493 (6 Cir. 1965).
 
 
 13
 It is clear enough, we think, that the question asked by plaintiffs' counsel and so vigorously deplored by the defense was improper; No crime, state or federal, was formally charged or at issue. Any imputation of crime tends to be harmful. We do not regard the question, as the plaintiffs would describe it, as a mere inquiry whether the witness knew certain conduct was a crime. The question was not sympathetically or inquiringly asked. On the other hand, plaintiffs' and counsel's irritation and contempt for what they felt were concealed and reprehensible rebates are perhaps understandable.
 
 
 14
 We are not convinced that the asking of the question amounted to reversible error in this trial. There was immediate objection in the very midst of the question, and then, at some length, when it was completed. The question was not answered. The trial court sustained the objection and forthwith instructed the jury to disregard the question. The court did all it could do, short of ordering a mistrial. Of course, curative instructions to a jury usually leave a reviewing court mildly uncomfortable for they never absolutely assure that the vice at which the instructions are directed is thereby wholly eliminated. Mr. Justice Harlan noted this in his dissent in Jackson v. Denno, 378 U.S. 368, 435, 84 S.Ct. 1774, 1881, 12 L.Ed.2d 908 (1964), when he said, 'The danger that a jury will be unable or unwilling to follow instructions * * * arises every time a counsel or the trial judge misspeaks himself at trial and the judge instructs the jury to disregard what it has heard'.
 
 
 15
 The situation is one which calls for the exercise of discretion on the part of the trial court and for the balancing of probabilities on appellate review. Abuse of the trial court's discretion is not to be presumed. Fidelity & Cas. Co. v. Niemann, 47 F.2d 1056, 1060 (8 Cir. 1931). We have read all the testimony of witness Schwarz as it appears in the record before us. We have in mind that this was a prolonged and complicated trial; that Judge Meredith is an experienced judge; that the record reveals an apparent reluctance-- perhaps an understandable one-- on the part of the witness to testify as to the method of effectuating these rebates, and as to the extent thereof, among O'Fallon's customers; that the witness seems to have been less than completely candid; that this kind of thing is readily apparent to a jury; that the trial court even concluded that Schwarz' testimony 'was evasive' and cast doubt on his credibility, p. 482 of 241 F.Supp.; and that the court, whose responsibility it was to grant or deny injunctive relief, resolved that issue on the same record in favor of the plaintiffs.
 
 
 16
 The question should not have been asked, but we conclude that its utterance did not 'affect the substantial rights' of the defendants, within the meaning of 28 U.S.C. 2111, and that the district court's refusal to declare a mistrial was not 'inconsistent with substantial justice', under Rule 61, Fed.R.Civ.P. See Commercial Credit Corp. v. United States, 175 F.2d 905, 908 (8 Cir. 1949); Partlow v. Goldstein, 263 F.2d 169, 171-172 (8 Cir. 1959).
 
 
 17
 2. The adams letter. Adams Dairy had been one of Sanitary's most aggressive competitors in the Saint Louis market. For some time it had imported milk from beyond the area milk shed. Any such importation, Sanitary claimed, resulted in lower aggregate return to Sanitary's farmer members, for, with the market so infiltrated, less of their own raw milk then commanded the higher fluid milk price and more was necessarily sold at the lower price for milk used for manufactured dairy products. This aspect of the market is described by the trial court at pp. 478-479 of 241 F.Supp. Further, it was Adams which took the lead in competitively meeting Sanitary's reduced prices. Sanitary finally purchased Adams' assets as of January 1, 1964. The Adams opposition was thereby removed, Sanitary was able to process and sell milk out of the Adams plant, and the price war came to an end.
 
 
 18
 E. C. Adams, Jr., who had been president and general manager of Adams and who was retained by Sanitary as manager of the Adams plant, was called by the plaintiffs as an adverse witness. He was shown a letter, dated August 7, 1962, from Adams Dairy's lawyer to the Missouri Attorney General. The letter, a copy of which went to Mr. Adams, stated initially,
 
 
 19
 'During the past two years, a series of events has taken place which we would like to call to your attention as we feel that they indicate a violation of the criminal statutes of the State of Missouri, and are detrimental to the interests of those Missouri corporations that are in the business of processing, handling and selling of milk.'
 
 
 20
 It then named Sanitary and referred to its farmer-member suppliers, to Sanitary's demand upon Adams for a full supply contract, to O'Fallon's selling below cost, to a rumor that if Adams purchased all its raw milk from Sanitary O'Fallon's pricing practices would be adjusted, and to Adams' being forced to buy milk beyond the Saint Louis area. The letter then closed with a request for an appointment for Mr. Adams to discuss the matter personally with the attorney general.
 
 
 21
 When plaintiffs' counsel began to read the letter before the jury, defendants' counsel objected:
 
 
 22
 'Mr. Duncan: If Your Honor please, I am going to object to Mr. Riddle reading from the document that has not been offered in evidence. If he wants to ask Mr. Adams if he did this or if he authorized it, all right. But he is reading from a document that hasn't been offered in evidence and to which my objection would be that it is hearsay and not binding when it is written by a man's lawyer. If it is offered in evidence. I don't object, Your Honor, to him asking Mr. Adams if these things were true, but he is reading obviously from a letter that is not admissible in my opinion, and I object to that, Your Honor.
 
 
 23
 'The Court: Do you want to introduce the letter into evidence?
 
 
 24
 'Mr. Riddle: Yes, I will.
 
 
 25
 'The Court: Do you want to make your objection?
 
 
 26
 'Mr. Duncan: Yes. I will object to the letter as being hearsay, Your Honor, written by a lawyer, not binding on this defendant at all. It is objectionable for the reason it is hearsay.
 
 
 27
 'The Court: Overruled. It will be admitted. Proceed.'
 
 
 28
 The letter was then read in its entirety. A series of questions by plaintiffs' counsel about the letter followed. These, for the most part, were phrased in the second person as though the latter had been written by or at the instigation of witness Adams. Examples of these are:
 
 
 29
 'Q. Well, in this letter, you weren't hedging, you were just saying that they were the ones that were responsible for it, weren't you? A. Yes, sir.
 
 
 30
 'Q. That was your opinion at that time? A. Yes, sir.
 
 
 31
 'Q. Well, in the letter here that you wrote to the Attorney General, you said it was either below cost or at an unreasonably low price. A. My attorney said that, yes, sir.
 
 
 32
 'Q. It was your opinion that it was an unreasonably low price, wasn't it? A. Yes, sir.'
 
 
 33
 Counsel then asked,
 
 
 34
 'Q. You say your attorney said that; you never did make an effort to correct it or revise it when a copy of this letter was sent to you, did you? A. There was no point, it had already gone.'
 
 
 35
 The defense complains that the two-year period mentioned in the letter antedated Sanitary's entering into the processing end of the milk business with its O'Fallon purchase; that the letter was written by an attorney for a company not then connected with the defendants; that it was written when Adams Dairy itself was the object of similar charges; that it was not admissible to prove the truth of its statements; and that the defendants had no connection with the letter. The plaintiffs respond that the letter was an admission or a declaration against interest and was introduced only to refresh Adams' memory and to prove his intent and state of mind.
 
 
 36
 The letter's contents, of course, were hearsay and, while Adams obviously authorized its writing, we doubt whether any of the plaintiffs' arguments suffice technically to render it admissible. Nevertheless, we are not convinced that its reception amounted to prejudicial error. The objections were less specific than they might have been. Indeed, they intimate that counsel's initial concern was only with the reading of the letter prior to formal introduction and that it was 'all right' if Adams authorized it. There was no mention at all of what is now most vigorously complained of, namely, the suggestion of criminal action under state law. And even as to that the letter contains no positive charge of crime but only 'we feel that they indicate' language. In a strong case such as this we cannot conclude that the admission of this letter worked an injustice. Even in the more sensitive criminal law area we have been unwilling, in a strong case, to reverse because of the possible presence of technical error. See Homan v. United States, 279 F.2d 767, 773 (8 Cir. 1960), cert. denied 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88.
 
 
 37
 3. The references to bottling costs and to rumors. These appeared during the examination of plaintiffs' witness Walter Deschamp. This witness was an Adams employee who was retained by Sanitary for a time after its purchase of the Adams assets. Plaintiffs' counsel attempted to bring out through this witness an observation that the Adams plant was a more effective operation than O'Fallon and a statement as to Adams' cost of processing a half-gallon of milk. There were repeated objections on various grounds with assertions made by defense counsel that testimony along this line would be unfairly damaging. These objections were generally sustained although the witness did testify as to elements of cost which, if one were to add them, would amount to 31 1/4cents. On redirect, plaintiffs' counsel returned to this subject and asked,
 
 
 38
 'Q. So if your total figure here would come to thirty-one cents--
 
 
 39
 'Mr. Duncan: Now if Your Honor please, I object to that, and again I ask for a mistrial because I knew that is what we were going to get, that he was going to get a figure before this jury, if Your Honor please.
 
 
 40
 'The Court: Well, I am going to overrule your motion for mistrial, and the jury may disregard that. I have already told them that. Mr. Riddle, I want to admonish you for asking the question after I made a ruling on it.'
 
 The witness was also asked:
 
 41
 'Q. During that period of time, did you, in the position you occupied, receive any word purporting to be from Sanitary Milk Producers to the effect that if Adams Dairy would cease buying milk from outside the City of St. Louis and St. Louis area commonly referred to as import milk, that the prices in St. Louis, that the price war in St. Louis could be terminated and that the price would go back to a reasonable level?'
 
 
 42
 An objection and a conference at the bench followed. The jury was excused and the witness examined outside the jury's presence. The court then told counsel it would sustain the objection. When the jury returned the court stated,
 
 
 43
 'The Court: Members of the jury, in your absence the Court has determined that the question which was asked by Mr. Riddle of this witness was an improper question and accordingly the objection to the question has been sustained and this witness will not be permitted to answer this type of question. The question which he was asked would call for hearsay testimony which is not admissible because hearsay testimony is proved to be unreliable. Accordingly, you may disregard this question and case the implication of the question entirely from your mind and forget about it. We are only going to decide this case on testimony which is properly before the Court and which the Court admits in evidence, and that is the basis on which this case will be decided and on no other.'
 
 
 44
 Here again are the old issues whether material which is embraced in a question itself is inherently damaging and whether the court's directions to disregard are effectively curative. The citation of authorities at this point would add little, for the cases are decided upon their particular facts. We understand the concern of defense counsel. Yet we cannot conclude that prejudicial error is present in these exchanges. The 31cents figure was already in the record for anyone who could mentally add. The court's directions were unmistakably clear and positive. We think they were adequately curative and that the court did not abuse its discretion. One might conclude that it was the plaintiffs' cause rather than that of the defense which was damaged by this persistence on the part of plaintiffs' counsel.
 
 
 45
 4. The complaint in another action. Ozark Dairy, one of the present plaintiffs, had brought suit against Adams Dairy and two supermarket chains asserting violations of the antitrust laws and claiming damages for the period from 1959 to 1963. This suit was pending in the Eastern District of Missouri at the time of the trial in the present litigation. Also pending was still an earlier anti-trust suit by Ozark against Adams, other dairies and other supermarkets, but centering in the 1954-58 period. On cross-examination by the defense an Ozark official explained that the 1959-63 suit was filed in order to prevent the running of the statute of limitations; he insisted that, despite the presence of that suit, Ozark's antitrust damage was due to Sanitary. The Ozark complaint in the 1959-63 suit was then offered in evidence on the theory that it was a judicial admission attributing some of Ozark's injury to others than Sanitary. The court excluded the exhibit.
 
 
 46
 We find no error. Although it would not have been improper to admit the complaint, Ross v. Philip Morris & Co., 328 F.2d 3, 14-15 (8 Cir. 1964), its exclusion was not improper. The witness in his testimony had revealed to the jury the existence of the Ozark suit against Adams and others, the antitrust nature of that suit, and the fact that Ozark was claiming damages from defendants other than Sanitary for a period which included the years of Sanitary's alleged misdeeds. The fact and the details of the other litigation were thus before the jury. The formal complaint, in a sense, was legal addenda which the court in its discretion could choose not to have encumber the record. Of course, Ozark could not recover damages for the same injury twice but this possibility had not matured in the trial below.
 
 
 47
 5. The cumulative effect. Even though each of these evidentiary items alone is not so prejudicial as to require reversal, do they, in the aggregate, demand that result? We are not convinced that they do. Much of what was done here was do not condone, for we have the impression that there was an element of deliberateness on the part of plaintiffs' counsel, in the face of repeated adverse rulings by the court. By these tactics counsel to an extent succeeded in bringing before the jury matters and intimations which the court already had ruled out. Nevertheless, we are persuaded that it was not these evidentiary matters, even in the aggregate, which resulted in the verdict adverse to the defendants but that it was, instead, the stark and unavoidable ultimate fact of cash rebates in little brown envelopes. This was the convicting and damaging evidence. And it was not overcome by Sanitary's explanation, in the words of witness Schwarz, that 'i used cash and not checks, because I thought the rebate was going to be only for a couple of days'.
 
 
 48
 We therefore find no reversible error in the trial court's several rulings on evidence.
 
 
 49
 B. Standing to sue. This concerns only plaintiffs Bergjans Farm Dairy, Incorporated, and Patke Farm Dairy, Incorporated.
 
 
 50
 1. Bergjans' standing. The president of Bergjans testified that this plaintiff was a processor which sold its entire production to its identically owned 'sales company up in front of the building during this period'. The sales company then effected Bergjans' distribution. Further, 'when the price went down * * * there was a decrease in volume of the sales company, so the sales company didn't buy so much from Bergjans Farm Dairy'. Although Bergjans is a plaintiff here, the sales company is not. The defendants assert that Bergjans has no standing because it was only a processor and not a competitor or customer of Sanitary.
 
 
 51
 We are aware of such cases as Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147, F.Supp. 907 (D.Mass.1956), and Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6 Cir. 1962), cert. denied 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717, which deny antitrust recovery to a supplier of the manufacturer who is the one in competition with the named defendant. Those cases respectively say that 'It is well settled that despite its broad language 4 of the Clayton Act does not give a private cause of action of a person whose losses result only from an interruption or diminution of profitable relationships with the party directly affected by alleged violations of the antitrust laws' and intimate that a contrary decision could result in a windfall to the plaintiff, p. 909 of 147 F.Supp., and that those who operate through two entities must abide the consequences of so doing and that 'a supplier is too remote and too far removed from the direct injury to recover damages resulting from violation of the anti-trust laws directed against the supplier's customer', p. 395 of 308 F.2d.
 
 
 52
 We feel, however, that these cases are different factually from the present one and themselves indicate that the facts of the present case would be critically distinguishing. Bergjans and its sales company do not occupy the relationship of raw material supplier and manufacturer. Bergjans put out the finished product. All the milk processed by Bergjans flows through this sales company. The latter performs no processing or manufacturing. All this demonstrates that there was directness of competition between Bergjans and Sanitary, that any recovery by Bergjans is not in the nature of a windfall, and that Bergjans' injury is something more than remote, is not derivative but direct, and is the proximate result of Sanitary's misdoing. We feel that it would be less than realistic to say that Bergjans is not one which 4 of the Clayton Act, 15 U.S.C. 15, is designed to protect. The situation is within the implications of Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 697-702, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), and Radovich v. National Football League, 352 U.S. 445, 453-454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), and directly within the holdings in Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9 Cir. 1955), and South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4 Cir. 1966), reversing 241 F.Supp. 259 (E.D.S.C.1965).
 
 
 53
 We regard Karseal and the South Carolina case as sound in their approach and application and as persuasive precedent here. We hold that Bergjans has standing to sue.
 
 
 54
 2. Patke's standing. Patke has its plant and sells its milk at wholesale and retail in Franklin County, Missouri. Franklin County is immediately west of Saint Louis County. The defendants point out that on the wholesale level Patke did not sell in Saint Louis and Sanitary did not sell in Franklin, and that on the retail level Sanitary did not sell anywhere in Missouri. It is then argued that any injury to Patke in Franklin County is too remote and speculative to be compensable.
 
 
 55
 There is evidence in the record, however, to the effect that Saint Louis dairies were in competition in Franklin County with Patke; that the majority of people in Patke's trade area 'work in St. Louis and Commute each day'; that many of Patke's customers buy in Saint Louis if there is a price advantage there; that the market in Saint Louis controlled Patke's price; and that Patke lost customers during the price war. With the record in this state, it 'discloses sufficient evidence for a jury to infer the necessary causal connection' between Patke's injury and the defendant's antitrust violations, as the Supreme Court described the situation in Continental Ore Co., supra, p. 700 of 370 U.S., 82 S.Ct. 1404. Patke therefore has standing to sue.
 
 
 56
 C. Instructions and sufficiency of the evidence. The defendants complain of the court's charge and of the insufficiency of the evidence to support their conviction under each of Counts I, II and IV.
 
 
 57
 1. Count I and the conspiracy to fix prices. As to this, the defendants make several arguments. It is first said that this count pleads a conspiracy by Sanitary and others to fix fluid milk prices both at wholesale and at retail; that the court's charge permitted the jury to return a verdict for the plaintiffs if it found either a conspiracy to fix wholesale prices or one to fix retail prices; that, however, the trial court itself at p. 486 of 241 F.Supp., found that 'the preponderance of the evidence did not establish * * * that any conspiracy * * * was formed' to fix wholesale prices; and that, therefore, because the jury might have based its adverse Count I finding on wholesale price fixing, this is inconsistent with the trial court's own determination.
 
 
 58
 We reject this argument, first, because the record before us does not disclose that the defendants took specific exception to the wholesale price fixing instruction and, second, because we do not at all relate to the trial court's comment in its opinion to the subject matter of its Count I instructions. The court on p. 486 was speaking of the third count which had to do with conspiracy to monopolize; it was not speaking of the first count which had to do with conspiracy to fix wholesale and retail prices. The opinion refers to wholesale price of all milk in the Saint Louis market; the instruction refers to the price at which Sanitary 'would sell its milk at wholesale to others' in Saint Louis. And the rebate maneuver, under all the circumstances of this case, obviously supports a finding of conspiracy to fix wholesale as well as retail prices.
 
 
 59
 The defendants argue next that the complaint alleges a conspiracy to fix prices low, whereas the court found a conspiracy to keep them high in order to maintain the secrecy of the rebates. This argument is unduly confined to one narrow subparagraph of the first count and overlooks the general allegations of that count.
 
 
 60
 It is then argued that the inference of a conspiracy to control retail prices is not supported by the evidence. Here, again, the very existence of the secret rebates in itself could be said to be the complete answer to this argument. Moreover, it does not suffice to say, as the defendants do, that Sanitary milk was competing with other brands on the same retail shelf; that if the retailer increased the sale of the Sanitary milk it was only at the expense of his sale of other brands; and that it was in Sanitary's interest to maintain a low price so as to increase it volume. But the retailer who reduced his Sanitary price because of the rebate suffered on loss when his own customers shifted from his high priced milk to his Sanitary milk. Further, he had a chance to gain by drawing customers from competing retailers who did not carry Sanitary. Sanitary's reason for professing a high retail price was to keep the existence of the rebates secret. Discovery would have led, as it ultimately did in July 1962, to price reductions by all other processors, thereby destroying Sanitary's price advantage.
 
 
 61
 Finally, it is argued that a valid claim must be based on some overt act done pursuant to the conspiracy and resulting in damage and that the instructions as to this were not adequate. But even if this is so, teh argument founders on the facts that here, as is commonly the case, there was no direct evidence of the existence of a conspiracy; that the jury and the court had to infer it from the evidence as to price structures and rebates; and that on this record such inference is proper and supplies any need for an overt act.
 
 
 62
 See and compare, generally, Beatrice Foods Co. v. United States, 312 F.2d 29, 43-45 (8 Cir. 1963), cert. denied 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199; Pevely Dairy Co. v. United States, 178 F.2d 363, 367-371 (8 Cir. 1949), cert. denied 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358; North Texas Producers Ass'n v. Metzger Dairies, Inc., 348 F.2d 189 (5 Cir. 1965), cert. denied 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468.
 
 
 63
 2. Count II and the attempt to monopolize. The trial court instructed the jury that an attempt to monopolize 'consists of coming dangerously close to acquiring the power to fix prices or control production by actions done with the specific intent to acquire that power'. It went on to instruct that if the jury found that the defendants, or any of them, entered into a conspiracy to fix prices, 'gave unlawful price discriminations to favored chain stores in order to get large volume of sales', sold below cost or at unreasonably low prices in order to destroy competition, purchased processing plants 'as a step in accomplishing their intent to monopolize; started a price war' in order to increase sales of raw milk, such practices, 'if done with the intent to acquire the power to fix the price, exclude competitors, or control the production of milk in St. Louis and St. Louis County amount to an attempt to monopolize' in violation of the statute.
 
 
 64
 The defendants argue various aspects of these instructions because of alleged inadequacies in wording and in supporting evidence. In particular, they urge that the court permitted the jury to find against them if they determined that any of the foregoing acts had been committed, rather than only if a pattern of unlawful conduct existed. Many of the objections so raised are unpersuasive on their face. One of the more important, however, is the argument that, although Sanitary produced about half the raw milk in the Saint Louis area, it was a small processor (only about two percent of the market) and thus could not be a potent factor in processing and wholesaling. It urges, too, that the evidence does not show that Sanitary sold below cost or at unreasonably low prices.
 
 
 65
 We hold against the defendants on these arguments. Sanitary's dominant position in raw milk production was necessarily an element of influence in anything it might choose to do and demanded caution on its part when it embarked on processing. Also, the reliability of Sanitary's accountant was seriously in controversy. This affected the position it took as to its costs. We cannot say that the evidence in its entirety, with its indication as to the borrowing ability of Sanitary, as to pressure brought on Adams and others, as to the purpose of the O'Fallon and Adams acquisitions, and as to pricing practices, was not supportive of the jury's findings, or that it did not justify the instructions given by the court, or that the instructions were prejudicially or confusingly phrased. Of course, an act in itself may be legal, but it still may become involved in an antitrust violation when it is 'part and parcel of unlawful conduct or agreement with others or * * * conceived in a purpose to unreasonably restrain trade, control the market, or monopolize * * *' Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 468-469, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962). We must consider the evidence as a whole. 'In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each'. Continental Ore Co. v. Union Carbide & Carbon Corp., supra, p. 699 of 370 U.S., p. 1410 of 82 S.Ct. When we do this, the instructions stand up and the evidence is adequate;
 
 
 66
 3. Count IV and price discrimination. This count alleges that Sanitary unlawfully discriminated between customers in Saint Louis and in Illinois and that this resulted in injury to the plaintiffs as competitors both of Sanitary at wholesale and of Sanitary's customers at retail, in violation of 2(a) of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act, 15 U.S.C. 13(a). The instructions reflect this allegation of competitive injury at both wholesale and retail levels.
 
 
 67
 The defendants argue that it was error to permit the jury to find a violation on the basis of competitive injury to the plaintiffs as retailers. They contend that under the Act injury to competition at the retail level requires the existence of purchases from a common discriminating supplier, and they point out that there were no purchases of processed milk by the plaintiffs from Sanitary. The defendants also complain of the court's instruction as to their 'meeting competition' defense under 15 U.S.C. 13(b). The dispute is over the generality of a price reduction which may be made to meet competition at specific locations. It is claimed that the instruction permitted lower prices only in response to individual competitive situations.
 
 
 68
 We think, first of all, that this argument is largely just another way of arguing remoteness of the injury. In view of what we have said on the issue of standing, we are not persuaded by a claim of remoteness here.
 
 
 69
 We grant that, as the defendants say, the cases suggest, with respect to 'secondary-line' situations under 2(a), a requirement of purchases from the same vendor. See Klein v. Lionel Corp., 237 F.2d 13, 14 (3 Cir. 1956); Bolick-Gillman Co. v. Continental Baking Co., 206 F.Supp. 151, 154 (D.Nev.1961); Baim & Blank, Inc. v. Philco Corp., 148 F.Supp. 541, 543 (E.D.N.Y.1957). We feel, nevertheless, that this record permitted an inference by the jury that Sanitary, with its secret rebates and the attendant maneuvering through its thereby favored Saint Louis outlets, was participating in the dictation of the retail price of its processed milk in the Saint Louis market, that by so doing it was providing competition with the plaintiffs at the retail level, with the situation, rather than being secondary in nature, was, in fundamental character, primaryline competition at retail between the plaintiffs and Sanitary. The retail aspect thus parallels the wholesale one. Klein and similar cases are not factually controlling.
 
 
 70
 Neither are we convinced that there was prejudicial error in the trial court's instruction as to meeting competition. Although, as is always the case, ways can be suggested in which an instruction may be improved, we regard the court's charge on this aspect of the case as fair and not misleading for the jury. The reference to unjustified general reductions in price was tied in, and properly so, to 'the adoption of a discriminatory selling policy'. And we agree with the plaintiffs that the evidence does not show that Sanitary effectuated a general price reduction.
 
 
 71
 We are satisfied, too, despite Sanitary's comparatively small portion of the Saint Louis processed milk market, as to the sufficiency of the evidence on Count IV and the issue of substantial lessening of competition or injury to competition within the language of 2(a). We have in mind as to this the very nature of the dairy business. We note generally that it is highly competitive; that it has a low margin of profit and little elbow room; and that a small decrease may entail severe loss. See Beatrice Foods Co. v. United States, supra, p. 42 of 312 F.2d and Pevely Dairy Co. v. United States, supra, pp. 367-369 of 178 F.2d.
 
 
 72
 We find nothing of significance in plaintiffs' argument as to damages.
 
 
 73
 The judgment of the district court is therefore affirmed.
 
 
 74
 In view of the nature of the several points raised on this appeal, our comments and our disposition of the issues, attorneys' fees in connection with the appeal will be allowed the plaintiffs under 15 U.S.C.A. 15 but only in an aggregate amount of $4,000. These are to be taxed as part of the costs in this court. Cf. Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 222 (9 Cir. 1964), cert. denied 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87; North Texas Producers Ass'n v. Metzger Dairies, Inc., supra, p. 197 of 348 F.2d; North Texas Producers Ass'n v. Young, 308 F.2d 235, 246 (5 Cir. 1962), cert. denied 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733. The usual other costs are allowed except that the expense of Volume II of the supplemental record submitted by the plaintiffs is not allowed. The plaintiffs' request for allowance of their disbursements for the trial transcript and for their briefs is denied.